ARVIN NORTH AMERICAN
AUTOMOTIVE, Appellant–
Plaintiff,

v.

REVIEW BOARD OF THE INDIANA DEPARTMENT OF EMPLOYMENT AND TRAINING SERVICES, et al., Appellees–Defendants.

ARVIN NORTH AMERICAN
AUTOMOTIVE, Appellant–
Plaintiff,

v.

REVIEW BOARD OF THE INDIANA DEPARTMENT OF EMPLOYMENT AND TRAINING SERVICES, et al., Appellees–Defendants.

CUSTOM EXTRUSIONS,
Appellant–Plaintiff,

v.

REVIEW BOARD OF THE INDIANA DEPARTMENT OF EMPLOYMENT AND TRAINING SERVICES, et al. and William E. Burns, et al., Appellees–Defendants.

Nos. 93A02–9102–EX–89, 93A02–9011–EX–690, 93A02–9001–EX–691.[1]

Court of Appeals of Indiana,
Fifth District.

Aug. 24, 1992.

Transfer Denied Nov. 18, 1992.

---

**1.** By Order of the Chief Judge, the above-captioned cases were ordered consolidated for consideration on appeal. *See* Ind.Appellate Rule 5(B).

S.R. Born, Douglas C. Haney, Ice Miller Donadio & Ryan, Indianapolis, for appellant-plaintiff Custom Extrusions.

Ronald R. Snyder, Kenneth J. Yerkes, Lester H. Cohen, Barnes & Thornburg, Indianapolis, for appellant-plaintiff Arvin North American Automotive.

Nora L. Macey, Richard J. Swanson, Janice E. Kreuscher, Segal and Macey, Indianapolis, for appellees-defendants William E. Burns, et al. and Delbert K. Abbott, et al.

Edward J. Fillenwarth, Fillenwarth Dennerline Groth & Baird, Indianapolis, for appellees-defendants Oran K. Abbett, et al.

RUCKER, Judge.

Appellants Custom Extrusion (Custom), and Arvin North American Automotive (Arvin I and II)[2] (collectively referred to as "Employers") appeal from decisions of the Review Board of the Indiana Department of Employment and Training Services (Review Board) granting unemployment benefits to employees who had previously been on strike. We rephrase the common issues for our review as:

1. Is an employer's hiring of permanent replacements for striking employees a sufficient basis for a finding that the employment relationship has been severed?

2. Is a striking employee required to make an unconditional offer to return to work in order to qualify for unemployment benefits?

3. Was the Review Board's decision supported by the evidence?

Arvin II raises the additional issue of whether each of the striking employees carried the burden to prove termination of his or her employment.

We affirm.

Custom operates a manufacturing plant in Connorsville, Indiana with a normal complement of 31 bargaining unit employees. The employees, who are represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its affiliated Local 151 (UAAIW) went on strike March 11, 1989. The following day Custom notified the striking workers that it would begin hiring permanent replacements if the striking workers did not return to work by March 14. The workers did not return to employment and by March 21 Custom had hired a full complement of replacement workers. On that date, UAAIW representatives offered to accept Custom's last offer of contract terms if all 31 strikers could

---

2. Arvin North American Automotive is the employer in two of the cases consolidated for this appeal. In order to avoid confusion and to remain consistent with the parties' briefs, we refer to this employer as Arvin I and Arvin II.

return to work. Custom informed the representatives that replacement workers would not be terminated to make room for returning strikers. Thereafter, Custom had job openings available due to employee turnover.

Arvin I operates a manufacturing facility at North Vernon, Indiana where 202 bargaining unit employees are represented by Local 301 of the UAAIW. The employees began to strike April 13, 1989. On April 24, Arvin I began employing replacement workers, and by that time some strikers had begun returning to work. By June 27 there were 30 job openings available. On that same date, Arvin I informed its striking employees that it would not terminate the replacement workers in order to accommodate returning strikers, but rather would place the strikers' names on a preferential recall list for future job openings. By September 25, 1989, there were 10 job openings available.

Arvin II operates three manufacturing facilities in Bartholomew County: "Gladstone," "Arvinyl," and "Tech Center." The three facilities constitute a single bargaining unit of 1,027 employees who are represented by Local 1331 of the International Brotherhood of Electrical Workers (IBEW). The three facilities had been treated as separate divisions under the bargaining agreement. Arvin II employees went on strike May 1, 1989 and on May 9, 1989, Arvin II began hiring replacement workers. The strike continued until December 12, 1989, at which time Arvin II and IBEW reached a negotiated settlement.

Throughout the course of the strike against Arvin II a number of striking employees presented themselves for work. The replacement workers were not terminated to accommodate returning strikers and many strikers who presented themselves for work were not reinstated.

At the beginning of the strike there were 680 job openings at Gladstone. Arvin II transferred 450 jobs from its Gladstone facility to other Arvin plants in order to maintain production. By May 31, 1989, Arvin II had filled 258 positions at Gladstone. Thereafter, the strategy of Arvin II

involved returning jobs to the Gladstone plant when there were sufficient available returning strikers and replacements to operate a product line. Arvin II eventually returned 215 of the 450 positions to Gladstone on a piecemeal basis.

By June 13, 1989, Arvin II had filled all 90 pre-strike positions at the Tech Center plant. The pre-strike workforce at the Arvinyl plant totaled 258 workers, and by July 17, 1989, Arvin II had filled 269 positions at that plant with permanent replacements and returning strikers. Thereafter, Arvin II trimmed the size of the Arvinyl workforce. The strike ended on December 12, 1989, with an agreement between Arvin II and IBEW which did not reinstate the strikers. The size of the Gladstone workforce was not returned to pre-strike levels.

The striking employees from Custom, Arvin I and Arvin II filed applications with the Indiana Employment Security Division requesting unemployment benefits under the terms of Ind.Code § 22-4-1-1 et seq., commonly referred to as the Indiana Employment Security Act (the "Act"). Each of the three groups of claims were referred to an Administrative Law Judge (ALJ) for an initial determination of whether the Act's labor dispute provision disqualified the claimants from receiving benefits. After conducting a hearing in each case, the ALJ entered written Findings of Fact supporting the striking workers' entitlement to unemployment benefits. Employers appealed to the Review Board; after a hearing, the Review Board modified the ALJ decisions only regarding the effective starting date in Arvin I for entitlement to benefits. In all other respects the Review Board sustained the ALJ's decisions.

It is from the decisions of the Review Board the employers now appeal. Additional facts will be recited where relevant.

■ This court has exclusive, original jurisdiction to review decisions of the Review Board of the Indiana Department of Employment and Training Services for errors of law pursuant to I.C. § 22-4-17-12. On review we must determine whether the decision of the Review Board is reasonable in light of its findings. *Shortridge v. Re-*

*view Bd. of Employment Sec. Div.* (1986), Ind.App., 498 N.E.2d 82, 87.

## I.

Employers argue on various grounds that the Review Board's decisions in allowing unemployment benefits to the striking workers are contrary to fact and law. The common thread woven through each of the Employers' arguments is that the act of hiring permanent replacements for striking employees does not automatically terminate employment. Accordingly, absent an affirmative termination of the employment relationship, as when the striking employee makes an unconditional offer to return to work which is refused, the replaced employee is not entitled to benefits.

■ Eligibility for unemployment benefits turns on the application of I.C. § 22–4–15–3 which dictates in relevant part:

(a) An individual shall be ineligible for waiting period or benefit rights: For any period with respect to which his total or partial or part-total unemployment is due to a labor dispute at the factory, establishment, or other premises at which he was last employed.

(b) This section shall not apply to an individual if he has terminated his employment, or his employment has been terminated, with the employer involved in the labor dispute ...

Under the terms of the Act, a claimant is ineligible for benefits if his or her unemployment is the result of a labor dispute unless the claimant or the employer has terminated the employment. *Id.*

■ Whether the hiring of permanent replacements for striking employees terminates the employer-employee relationship, thereby making the employees eligible for benefits, was squarely addressed in *Jackson v. Review Bd. of Indiana Sec. Division* (1966), 138 Ind.App. 528, 215 N.E.2d 355. In that case striking employees were replaced by their employer within a week after a strike had begun. When the strike ended the employees sought reinstatement and were informed by their employer that work was not available. On an appeal from the denial of benefits, this court determined the striking employees were permanently replaced, the relationship of employer and employee had therefore been severed and the labor dispute section was not applicable. *Jackson,* 215 N.E.2d at 360.

In the case before us, Employers argue *Jackson* is no longer good law because it predates the 1980 amendment to the Act which replaced a "work stoppage" disqualification for benefits with a "labor dispute" disqualification. According to Employers, in light of the amendment and various federal court decisions, the hiring of permanent replacements is no longer relevant in determining benefit eligibility and does not terminate the employment relationship. We disagree.

Employers' argument in this case has already been addressed by this court in *A–1 Compressor, Inc. v. Review Bd. of Indiana Employment Sec. Div.* (1985), Ind.App., 481 N.E.2d 1120, *trans. denied.* In that case we rejected the applicability of federal labor law and affirmed the continued validity of *Jackson.* We pointed out that *Jackson* did not turn on a finding of work stoppage, but rather on termination of the employer-employee relationship. "[W]here employees go on strike and are permanently replaced, they should not be disqualified from benefits under the Labor Dispute Section...." *A–1, supra* at 1123, citing *Jackson, supra,* 215 N.E.2d at 535. In the case before us we find no compelling reason to depart from our decision in *Jackson* and we decline Employers' invitation to overrule *A–1.*

■ Employers further contend there must be a causal relationship between the hiring of permanent replacements and the resulting unavailability of work. According to Employers, the employment relationship is actually terminated within the meaning of the Act when, and only when, the presence of permanent replacements is the efficient cause of work unavailability. Thus, concludes Employers, there must be a showing of both permanent replacement and no work available. It follows from Employers' argument that striking work-

ers making a claim for unemployment benefits shoulder the burden of not only demonstrating their permanent replacement, but also showing the existence of unavailability of work at the workplace which was caused by their replacement. We cannot agree with Employers' analysis.

The permanent replacement of a striking worker by an employer realistically presupposes the work he or she once performed is no longer available to that worker. "Permanent replacement" and "unavailability of work" are not terms of art but are rather concepts grounded in the practical concerns entailed in making a determination whether, pursuant to statute, the employment of striking workers has been terminated. We decline Employers' invitation to burden these concepts in an unduly technical fashion that is neither realistic nor comports with existing case law. For example, the permanent replacement of an employee may not be "permanent" at all. We have previously observed the "phrase 'permanent replacement' requires neither that the replacement employees eternally remain with the company nor that the striking employees be eternally barred from any further employment with the company." *Allen v. Review Bd. of Indiana Employment Sec. Div.* (1986), Ind.App., 494 N.E.2d 978, 980–81. Likewise, the phrase "unavailability of work," which is often an important factual focus in cases where termination by permanent replacement is an issue, refers to the distinction between a "temporary" and "permanent" replacement. See *Jackson, supra,* 215 N.E.2d at 359–60.

The rule of *Jackson* is clear: "where permanent replacements [have] been hired to supplant striking employees, the employment relationship between the strikers and the company [is] sufficiently severed so as to render the labor dispute disqualification inapplicable." *Allen, supra,* 494 N.E.2d at 980. We are not persuaded this rule should be expanded in the fashion suggested by Employers. Because "unavailability of work" is inherent in the term "permanent replacement," we hold that once striking employees are permanently replaced their employment is terminated within the meaning of the Act. While the burden is clearly on the claimants to show that they have been permanently replaced, *Jackson, supra,* their burden to prove termination is fully satisfied by such a showing.

To rule otherwise would require a striking employee to make an unconditional offer to return to work in order to test the permanency of the replacement, a proposition which the Employers promote, but we do not accept. Under the Act, there are three specific ways in which the labor dispute disqualification no longer applies, namely: the striking worker terminates his or her own employment, the employer terminates the striking worker, or the strike ends. I.C. § 22–4–15–3(b). Where striking workers have been permanently replaced, to require them to also make an unconditional offer to return to work as a necessary predicate for a finding that the labor dispute is inapplicable would make a nullity of the statutory provision concerning the employer's option to terminate the employment relationship. An offer to unconditionally return to work would constitute an effective end to the strike, which is a separate statutory ground for finding the labor dispute disqualification inapplicable.

We therefore reaffirm long standing Indiana precedent that an employer's act of permanently replacing striking workers severs the employer-employee relationship thereby removing the statutory labor dispute disqualification. A striking worker need not make an unconditional offer to return to work as proof that he or she has been permanently replaced.

## II.

Next, Employers challenge the Review Board's decision as unsupported by the evidence. Custom argues the record reveals it has not terminated the employment of any claimant, has not rejected any claimant's unconditional offer to return to work, and because Custom is experiencing a rapid turnover of replacement workers, it is "able to make one or more job openings available to a striker who makes an uncon-

ditional offer to return to work." *Brief of Appellant Custom* at 26.

■ We have already determined that a striking worker need not make an unconditional offer to return to work as proof that he or she has been permanently replaced. Further, as a general rule, the decision of the Review Board is conclusive and binding concerning all questions of fact. This court is limited to examination of evidence and reasonable inferences drawn therefrom which would support the Board's decision. We must accept the facts as found by the Review Board unless its findings fall within one of the exceptions for which the court may reverse. *Cheatem v. Review Bd. of Indiana Dep't of Employment and Training Services* (1990), Ind.App., 553 N.E.2d 888, 891 citing *Shortridge, supra.* Those exceptions include:

(1) The evidence on which the Review Board based its findings was devoid of probative value;

(2) The quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis;

(3) The result of the hearing before the Review Board was substantially influenced by improper considerations;

(4) There was no substantial evidence supporting the findings of the Review Board;

(5) The order of the Review Board, its judgment or finding, is fraudulent, unreasonable or arbitrary;

(6) The Review Board ignored competent evidence.

*Id.*

■ Here, the ALJ determined that all strikers at Custom had been permanently replaced by March 21, 1989, and there were no job openings available for them. Although the evidence is not without conflict, the record reveals Custom's general manager testified that a full complement of replacement workers had been hired by March 21, 1989, and that no positions were available for returning strikers as of that date. *Record* at 136–37. Subsequent openings at Custom, reflecting the econom-

ic changes of its business and unrelated to the strike, are irrelevant to the Board's inquiry whether and when the striking employees were permanently replaced. We accept the ALJ's findings as supported by substantial evidence and Custom has failed to demonstrate any exception requiring this court to reverse the Board's decision.

Arvin I contends the decision of the Board declaring claimants were terminated for purposes of the Act is erroneous because there were 10 positions available at the North Vernon plant on September 25, 1989, the date which the Board determined all striking workers had been permanently replaced. Arvin I insists the hiring of *some* permanent replacements should not result in benefit eligibility for *all* striking workers because work was available for at least ten striking employees. We disagree.

■ Prior to the strike, Arvin I employed 202 bargaining unit employees at its North Vernon facility. In June 1989, Arvin I informed striking workers that permanent replacements were being hired and would not be released to make room for the strikers to return to work once the strike ended. There were 30 vacancies available at that time. In response, 32 strikers abandoned the strike and returned to work. *Record* at 48. At a meeting on September 25, 1989, Arvin I informed a UAAIW representative that replacement workers would not be displaced to accommodate strikers returning to work and in the event of future layoffs replacement workers would be given preference for recall over striking employees. Arvin I also advised the representative there were 10 job openings available at that time.

In deciding that the striking workers had been terminated by permanent replacements, the Board found that the availability of 10 positions was *de minimus* in relation to the size of the total work force and a normal employee turnover rate of approximately 13½%. Arvin I attacks this finding as a "legal fiction" inexcusably relieving the claimants of their burden of demonstrating that the hiring of permanent replacements has precluded their return to

work. Arvin insists that proving "no jobs" with "some jobs" is impermissible.

While Arvin I's position is facially appealing, it is not persuasive; we cannot say that Arvin I has demonstrated that the Board's decision is unreasonable. Rather, Arvin I's position represents an extension of an argument we have already rejected, namely: that the presence of permanent replacements does not sever the employment relationship unless and until those replacements cause no work to be available. We again emphasize the claimants carry the burden of demonstrating they have been permanently replaced; they do not carry the additional burden of demonstrating a causal relationship between their replacement and the continuing unavailability of work. If the existence of *subsequent* high turnover at a facility does not invalidate the Board's finding of termination, then the existence of a small number of job openings, not factually linked to the strike, will not invalidate the Board's determination when the number is significantly less than that facility's turnover rate. While a different decision might have been made concerning an appropriate cutoff number for the *de minimis* finding, we hold the Board's use of the *de minimis* concept in making the termination decision was not unreasonable.

There is probative evidence that the Arvin I claimants were terminated within the meaning of I.C. § 22–4–15–3(b) on September 25, 1989. Therefore, we will not disturb the decision of the Board.

Arvin II asserts the determination of the Board that the claimant were terminated is erroneous because work was continuously available at the Gladstone, Arvinyl, and Tech Center facilities. Arvin II also attacks the Board's computations, arguing it was erroneous to treat the jobs transferred from Gladstone to other plants as equivalent to jobs that had been filled with permanent replacements because the removal of the jobs was a temporary measure that was due to the labor dispute. Arvin II concludes the evidence does not show claimants were precluded from returning to work and therefore claimants were erroneously excused from their burden of proof to show they were no longer subject to the labor dispute disqualification.

■ The Board took the position that the economic decision to remove 450 jobs from Gladstone at the onset of the strike was solely that of Arvin II. The striking employees who had previously filled those positions were, in the view of the Board, as surely 'terminated' as though the positions had been filled with permanent replacements. We do not find the Board's position unreasonable.

Once all remaining jobs had been filled with permanent replacements and returning strikers, employees at the Gladstone plant were then terminated for purposes of the Act, regardless of whether it might have been Arvin II's intent to return the jobs at some time in the future. As we have noted earlier, permanent replacement of striking employees by the employer, the key to a finding of termination within the meaning of the Act, does not require "that the striking employees be forever barred from any further employment from with the company." *Allen, supra,* 494 N.E.2d at 981.

■ Further, Arvin II's argument that there is no evidence claimants were precluded from reinstatement is yet another version of Employers' argument that striking employees must unconditionally return to work before they may be considered terminated for purposes of the Act. We continue to reject that perspective in all its guises.

There was sufficient evidence before the Board from which it could reasonably determine the Arvin II claimants were terminated within the meaning of I.C. § 22–4–15–3(b). All of the available jobs had been filled at each plant on the specified dates, and therefore the claimants were no longer disqualified for unemployment benefits on those dates. We agree with the perspective of the Board that the purely economic decisions of Arvin to remove the jobs at Gladstone *en masse* at the onset of the strike and to return 215 of the jobs in a piecemeal fashion thereafter was irrelevant to the validity of Board's decision as of

each date. Although Arvin II's decision to remove the jobs was in response to the strike, that decision and the decision to return some of the jobs at a later date, was solely in the hands of Arvin II management and unrelated to whether the strikers had been previously permanently replaced.

There is no question here that the decision to remove the Gladstone product lines, an action perceived by Arvin II to be in its own best interests, was one which Arvin II was entitled to make. However, once the jobs were removed and the remaining jobs filled with permanent replacements, the unemployment of the Arvin II strikers was no longer due to the labor dispute but rather was directly linked to economic considerations.

We hold the decision of the Board in granting unemployment benefits to employees who had previously been on strike was supported by substantial evidence and was not contrary to law.

Judgment affirmed.

BARTEAU and CHEZEM, JJ., concur.