846 P.2d 1063

**Max J. SALAZAR, Petitioner–Appellant,**

v.

**NEW MEXICO EMPLOYMENT SECU-RITY DIVISION and Medite Corporation, Respondents–Appellees.**

No. 20316.

Supreme Court of New Mexico.

Jan. 5, 1993.

Rehearing Denied Feb. 3, 1993.

Northern New Mexico Legal Services, Craig B. Fretwell, Las Vegas, for petitioner-appellant.

Tom Udall, Atty. Gen., Douglas McKinnon, Sp. Asst. Atty. Gen., Albuquerque, for respondents-appellees.

OPINION

FRANCHINI, Justice.

This is an appeal from the district court's order affirming an administrative decision of the Department of Labor, Employment Security Division (the Division), denying appellant unemployment benefits due to the labor dispute disqualification provision in NMSA 1978, Section 51-1-7(D) (Repl.Pamp.1991). The sole issue raised on appeal is whether appellant was subject to the labor dispute disqualification once his employer hired a permanent replacement to fill his job. This issue raises a question of first impression in New Mexico. We affirm the district court.

I

Appellant Max Salazar does not challenge the findings of fact entered by the Division's appeals bureau and subsequently adopted by the district court. On June 11, 1990, Salazar, and other members of Carpenters Local 1319 of the Western Council of Industrial Workers (the union), went on strike against their employer Montana de Fibre (now known and hereinafter referred to as Medite). On June 12, 1990, Medite sent Salazar and other striking employees a letter stating that if they did not return to work by June 18, 1990, the company would seek to hire permanent replacements for their positions. All employees who did not return to work by June 18 were perma-

nently replaced on or before June 25, 1990. Salazar did not return to work and subsequently filed for unemployment compensation benefits on September 14, 1990.

On October 24, 1990, the union was decertified pursuant to a membership vote. Picketing ceased, and by mutual agreement the dispute was ended. By letter to Medite dated November 14, 1990, Salazar requested that he be reinstated in his job. Medite responded in a letter dated November 19, 1990, stating that after Salazar went on strike a replacement was hired to fill his position, and the company was unable to return him to work. Salazar obtained other employment on December 11, 1990.

## II

Section 51–1–7 in pertinent part provides: An individual shall be disqualified for, and shall not be eligible to receive, benefits:

\* \* \* \* \* \*

D. for any week with respect to which the division finds that his unemployment is due to a labor dispute at the factory, establishment or other premises at which he is or was last employed * * *.

■ The question of whether an employee qualifies for unemployment benefits or falls within the disqualifying labor dispute provision requires a determination that a labor dispute existed, as well as a determination that the employee's unemployment resulted from the labor dispute. *Wellborn Paint v. New Mexico Employment Sec. Dep't*, 101 N.M. 534, 539–40, 685 P.2d 389, 394–95 (Ct.App.1984). Designating that the individual's unemployment be "due to" a labor dispute, Section 57–1–7(D) "imposes a requirement of causal connection between the unemployment for which benefits are claimed and a labor dispute." *Id.* at 540, 685 P.2d at 395.

■ Salazar argues that the labor dispute disqualification provision ceased to apply on June 25 when Medite hired a permanent replacement for his position. Once the permanent replacement was hired, Salazar contends the cause of his unemploy-

ment was the existence of the replacement rather than the labor dispute. The Division counters that the labor dispute disqualification was applicable until the dispute ended on October 24, because Salazar did not accept the employer's offer to return to work, nor did he seek reinstatement or receive a notice of discharge from the employer during the course of the dispute.

Salazar relies on *Ruberoid Co. v. California Unemployment Insurance Appeals Board*, 59 Cal.2d 73, 27 Cal.Rptr. 878, 879, 378 P.2d 102, 103 (1963), for the proposition that the labor dispute disqualification ceases to apply when striking employees have been permanently replaced. In *Ruberoid*, the employer, Mastic Tile Corporation of America (Mastic), sent striking employees a letter informing them they had been permanently replaced together with a check for their pro rata vacation pay to the date the strike began. During the course of the dispute and after receipt of the notification of permanent replacement, fifteen striking employees applied to be rehired by Mastic. Only seven of the fifteen were rehired, and all those rehired lost the seniority and privileges they had accrued through prior employment. It was on these facts the court reasoned that at the moment the strikers were permanently replaced, "[t]he employer broke the chain of causation between the trade dispute and the unemployment and put in place of the dispute, as the proximate and direct cause of the unemployment, its own counter action." *Id.* 27 Cal.Rptr. at 884, 378 P.2d at 108.

We find more applicable the result reached in *Windigo Mills v. California Unemployment Insurance Appeals Board*, 92 Cal.App.3d 586, 155 Cal.Rptr. 63 (1979). In *Windigo Mills*, striking employees were sent a letter by the company's president warning them that if they did not return to work by a certain date, the company had the right to replace them. Later, after notification by a union representative that they had been permanently replaced, a number of striking workers requested to return to work. The workers were reinstated with full benefits, even though other

new employees had been hired on a permanent basis. In determining that benefits had been properly denied, the court in *Windigo Mills* was guided by the proposition that "unless there is an *unequivocal act* by the employer discharging the strikers, the claimants must demonstrate willingness to return to work [and be denied reemployment] in order to be eligible for unemployment benefits." *Id.* 155 Cal.Rptr. at 72.

In this case, while Medite notified Salazar that he would be permanently replaced if he did not return to work, it did not take any additional steps indicative of actual termination of employment, such as enclosing payment for pro rata vacation pay. The letter sent to the striking employees by Medite did not instruct them that they would be terminated if they failed to report for work by June 18, it only stated that after that date "the company will seek to hire a permanent replacement for your position."

These circumstances are distinguishable from cases cited by Salazar in which employers unequivocally notified strikers by mail, during ongoing labor disputes, that permanent replacement meant termination of employment. *See Baugh v. United Tel. Co.*, 54 Ohio St.2d 419, 377 N.E.2d 766 (1978); *Sprague & Henwood, Inc. v. Unemployment Compensation Bd. of Review*, 207 Pa.Super. 112, 215 A.2d 269 (1965). The common factor in these cases is that the claimants did not become eligible for benefits until the employer notified them they would not be rehired. Here, there was no unequivocal act by the employer terminating the strikers' employment, nor did Salazar take any steps to obtain reemployment during the strike. One striking employee who requested reinstatement was put back to work on June 25, 1990, although he worked only that day and did not return.

We hold that an employer's notice to striking employees of an intent to permanently replace them during a labor dispute is not tantamount to termination of the strikers' employment. *See Rice Lake Creamery Co. v. Industrial Comm'n*, 15 Wis.2d 177, 112 N.W.2d 202, 205 (1961)

(holding permanent replacement of strikers does not terminate the employment status of the strikers as a matter of law). Where striking employees make no attempt to gain reemployment during the dispute, and absent a denial of reemployment by the employer or other unequivocal notice or act by the employer terminating the strikers' employment, the disqualifying provisions of Section 51-1-7(D) remain in effect. Accordingly, we affirm the district court's decision that Salazar became eligible for benefits only after October 24, 1990, when the labor dispute with Medite ended.

IT IS SO ORDERED.

MONTGOMERY and FROST, JJ., concur.

RANSOM, Chief Justice (dissenting).

I dissent from the foregoing opinion. Salazar contends that he was *no longer an "employee" on strike once he was replaced:* "[T]he permanent replacement of strikers severs the relationship between the labor dispute and the claimant's unemployment." Significantly, Salazar did not file for benefits until September 14, 1990, when he was no longer an employee. The dates between September 14 and October 24, 1990, when the labor dispute ended, should have been included in the period for which he was eligible for unemployment benefits. I agree with Salazar and with the Supreme Court of Ohio:

Accordingly, we find that the General Assembly did not intend that the statutory disqualification from unemployment compensation benefits * * * be applicable if, during the course of a *bona fide* labor dispute, the employer terminated the employee status and thereby caused the unemployment. In such an instance, although the labor dispute directly caused the initial unemployment, the statutory disqualification terminated with the severance of the employee status. At that moment in time the direct cause of the unemployment became the act of the employer. From then on the employer's action and not the labor dispute was the proximate cause of unemployment.

*Baugh v. United Tel. Co.*, 54 Ohio St.2d 419, 377 N.E.2d 766, 769 (1978). The Colorado Court of Appeals, in construing the Colorado version of the labor dispute disqualification statute, held that the employment relationship is terminated when a striking employee is permanently replaced. *Brannan Sand & Gravel Co. v. Industrial Claim Appeals Office*, 762 P.2d 771, 774 (Colo.Ct.App.1988), *aff'd sub nom. en banc, Federico v. Brannan Sand & Gravel Co.*, 788 P.2d 1268 (Colo.1990). Such a construction, the court found,

> furthers the state's neutrality in any labor dispute while not requiring an employer to finance a strike against itself. An employer receives the full protection of [the labor dispute disqualification] during the progress of the labor dispute so long as it does not act affirmatively to end the employment status of the striking worker. If, however, an employer acts to terminate the employment status during the labor dispute, thereby disturbing the status quo, the policies for affording the protection disappear.

*Id.* (citations omitted).

The majority holds that "an employer's notice to striking employees of an intent to permanently replace them during a labor dispute is not tantamount to termination of the strikers' employment." We are not dealing with "notice of intent"; rather, we are dealing, as of June 25, with the fact of permanent replacement. I can not agree with the representations in the opinion that there is neither an unequivocal act by the employer terminating the strikers' employment nor any indication that Salazar would have been denied reemployment during the course of the dispute after he had been replaced. The undisputed findings of fact state that:

> 7. All other employees who did not report to work by June 18 (all claimants inclusive) were permanently replaced on or before June 25, 1990.
>
> \* \* \* \* \* \*
>
> 12. After [October 24, 1990], the claimants either sent a letter to the employer or telephoned the employer asking for their jobs back.

> 13. In each case, the employer responded by letter informing the claimant that he had been permanently replaced.

I would reverse because Salazar was no longer an employee on strike once he had been permanently replaced; the employer-employee relationship was terminated. The underlying policy of Section 51-1-7(D) favors an employer whose *employees* are on strike; but it does not favor an employer who is receiving the services of permanent replacements for those employees. When the striking employee thus becomes a former employee, he or she should be entitled to benefits once that employee files a claim therefor and receives orientation and a work search program.

BACA, J., concurs.