**BRIDGESTONE/FIRESTONE, INC., Appellant,**

v.

**EMPLOYMENT APPEAL BOARD, Appellee,**

and

**Stanley M. Abrahamson, et al., Appellees.**

**No. 96–1267.**

Supreme Court of Iowa.

Oct. 22, 1997.

to quash was properly overruled. Therefore, the other issues raised by the parties are inconsequential.

Thomas W. Foley, John B. Tuffnell, and Thomas M. Zurek of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellant.

William C. Whitten, Des Moines, for appellee Board.

Ed Skinner of Skinner & Beattie, Altoona, and Mark T. Hedburg of Hedburg, Ward, Owens, & Vonderhaar, Des Moines, for appellee claimants.

Considered by LARSON, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

The issue we face in this judicial review proceeding is whether a letter the employer sent striking workers notifying them that they were being permanently replaced severed the employment relationship between the employer and these claimants. The agency found there was such a severance of employment and that the severance was the cause of the unemployment. The agency therefore concluded that the striking workers who applied for unemployment benefits (claimants) were not disqualified from such benefits under the provisions of Iowa Code section 96.5(4) (1993), a labor dispute disqualification provision. Because there was no evidence of misconduct, the agency allowed unemployment benefits to the claimants.

The district court concluded there was substantial evidence to support these findings as to those claimants who received the letter and affirmed the agency's award of benefits to them. We affirm on this issue.

Contrary to the agency, the district court found that not all of the claimants had received the replacement letter. The district court therefore remanded the case to the agency for a determination of whether under section 96.5(4) a work stoppage existed because of a labor dispute thereby barring those claimants who did not receive the replacement letter from receiving unemployment benefits. The effect of this remand order was to reverse the agency's decision awarding unemployment benefits as to these claimants. We affirm the district court's remand on this issue.

I. *Background Facts and Proceedings.*

Bridgestone produces tires for automobiles, trucks, and implements. Many of Bridgestone's Des Moines production employees are members of United Rubber Workers Local 310 (Union). Members of the Union went on strike on July 12, 1994. The strike ended on May 22, 1995, when the Union unconditionally offered to return to work. This appeal, however, concerns events that happened mid-way through the strike in January 1995.

Although Bridgestone began hiring temporary replacements as soon as the strike began, the company began hiring permanent replacements on January 4, 1995. Between January 7 and February 19, 1995, Bridgestone sent letters to a number of striking workers. Neither party introduced a copy of the actual letter sent. Nevertheless there is in evidence a copy of a letter Bridgestone sent to an employee who was on strike at the company's facility in Indiana. No one disputes that the contents of this letter represent what was sent to the striking workers in the case before us.

The letter stated in part:

Bridgestone/Firestone, Inc ... sent you a certified letter dated January 4, 1995, informing you that you had been permanently replaced and that you are entitled to certain preferential hiring rights. There has been some confusion about that letter.

To return to active employment, you must make an unconditional offer to return to work. Should you decide to do so, if there are no vacancies in your position or a substantially equivalent position, you will then be placed on the preferential hiring list, and will be offered reinstatement to your previous position or a substantially equivalent position as such vacancies arise. Absent such an unconditional offer to return to work, we will assume that you are remaining on strike.

Before the strike ended, none of the permanently replaced striking workers unconditionally offered to return to work. Instead, they filed for unemployment compensation. A Job Service representative granted the unemployment compensation in a series of determinations from January 31 to March 3, 1995. Bridgestone promptly appealed each

determination on the ground that the claimants were disqualified from receiving benefits because their unemployment was due to a work stoppage because of a labor dispute. *See* Iowa Code § 96.5(4) (stating claimants are disqualified from unemployment benefits if their "unemployment is due to a work stoppage because of a labor dispute").

By agreement, the parties consolidated the claims which totaled 604, submitted them to an administrative law judge (ALJ) on a certified record, and waived an evidentiary hearing. Of the 604 claimants, 501 had received the permanent replacement letter mentioned earlier; 103 had not.

Before submission, the ALJ wrote to the parties pointing out that the Job Service representatives' decisions had allowed benefits "upon a finding that the individual has been permanently replaced and thus is no longer unemployed as the result of a work stoppage incident to a labor dispute while others have received benefits upon a finding that the work stoppage has ended due to increased production at the employer's local facility." The ALJ suggested to the parties that the hearing on the merits "include evidence concerning which employees have received replacement letters and evidence as to the present level of productivity at the employer's facility."

The certified record the parties submitted to the ALJ contained evidence as the ALJ had requested. Based on this evidence, the ALJ found that "the stoppage of work ended January 15, 1995, because of the employer's renewed production activity." The ALJ therefore concluded that disqualification for unemployment benefits under Iowa Code section 96.5(4) ended on that date. In reaching its decision on this issue, the ALJ relied on *Crescent Chevrolet v. Iowa Department of Job Service*, 429 N.W.2d 148 (Iowa 1988) (holding that unemployment caused by labor dispute and its consequent work stoppage such as would disqualify claimants from unemployment benefits under Iowa Code section 96.5(4) ends when employer's operations are returned to a substantially normal basis, which may be before or after termination of underlying labor dispute).

The ALJ also found that the disqualification for benefits under Iowa Code section 96.5(4) no longer operated once the claimants had been permanently replaced. Acknowledging the issue of unemployment benefits for permanently replaced workers constituted an issue of first impression in Iowa, the ALJ wrote:

The language of Pennsylvania's labor dispute statute is similar to that of Iowa Code section 96.5(4). *See* 43 Pa. Cons. Stat. § 802(d). In *Canonsburg Gen'l Hosp. v. Unemployment Compensation Bd. of Review*, 156 Pa.Cmwlth. 533, 628 A.2d 503 (1993), the [court] ruled that the hiring of replacement workers, absent evidence of and a finding that continuing employment without rehiring was available to the striking workers, establishes that the striking workers have been terminated. The Supreme Court of Pennsylvania affirmed the Commonwealth Court in a per curiam decision. *See Canonsburg [General Hosp. v. Unemployment Compensation Bd. of Review]*, 540 Pa. 531, 658 A.2d 790, 790 (1995).

Conflicting results have been reached by some of Iowa's neighboring states when they have considered the impact of replacement workers. It must be noted, however, that the wording of the labor dispute provisions in their respective unemployment insurance laws are significantly different than the wording used by Iowa and Pennsylvania. Finding no contrary result in reported cases from other states having similar labor dispute language, the administrative law judge accepts *Canonsburg [ ]* as persuasive authority.

The ALJ therefore found the permanent replacement of striking employees severed the employment relationship. Because the relationship was severed, the claimants' unemployment under section 96.5(4) was no longer "due to a stoppage of work which exists because of a labor dispute." For that reason the disqualification in section 96.5(4) no longer applied to these claimants.

Because 301 claimants were sent replacement letters during the week of January 1, 1995, the ALJ concluded that these claimants were unemployed due to a stoppage of work

through the week ending January 7, 1995, and were no longer disqualified as of January 8. The remaining 200 claimants who were sent replacement letters did not receive letters until after January 14. They were therefore no longer disqualified after January 14. As mentioned, there were 103 claimants who did not receive replacement letters. They were also no longer disqualified after January 14 because the ALJ had determined that the work stoppage had ceased as of January 15 when Bridgestone's operations had returned to a substantially normal basis.

Bridgestone appealed to the Employment Appeal Board, challenging the ALJ's finding on the permanent replacement issue and the cessation of work stoppage issue. Contrary to the evidence, the board incorrectly assumed that all 604 claimants had received the permanent replacement letter. The board therefore limited its decision to the permanent replacement issue. In deciding the permanent replacement issue, the board relied on an administrative rule which provided:

> The relationship between employer and employee continues during the period of the labor dispute unless severed by the employer or employee.
>
> a. If the relationship is severed by the employer, Section 96.5(2) concerning discharge for misconduct shall govern.
>
> b. If the relationship is severed by the employee, Section 96.5(1) concerning voluntary leaving shall govern.

Iowa Admin. Code r. 345—4.34(3) (now codified at Iowa Admin. Code r. 871—24.34 (1997)).

In affirming the decision of the ALJ as to the eligibility of all 604 claimants, the board wrote:

> The Employment Appeal Board concludes the claimants involved in this action initially were involved in a labor dispute. However, when the employer sent the employees permanent replacement letters, the employer changed the relationship and discharged the employees. The employer has not alleged, nor has any evidence of any misconduct by the employees been presented in this action. Therefore, the Employment Appeal Board concludes the claimants were discharged for no disqualifiable reason and should be eligible for unemployment insurance benefits.
>
> . . . .
>
> The Employment Appeal Board also concludes the administrative law judge properly decided the dates of eligibility for the claimants involved with this action and those dates are affirmed.

Bridgestone filed a petition for judicial review in the district court, challenging the board's decision. Iowa Code § 17A.19. The court affirmed the board's decision in part. Bridgestone had maintained the letters did not inform the claimants that they were discharged. In response, the court agreed with the claimants that "the letters implied that the claimants did not have a job to return to when the labor dispute was ended and therefore the relationship between employer and employee was severed" as to the claimants who received the replacement letter. The court concluded substantial evidence supported the board's decision that the employment relationship was severed and there was therefore no disqualification under section 96.5(4). The court affirmed the board's award of unemployment benefits as to these claimants because there was no showing of misconduct as to them. *See* Iowa Admin. Code r. 345—4.34(3)(a) ("If the relationship is severed by the employer, [Iowa Code] section 96.5(2) concerning discharge for misconduct shall govern.").

Apparently the district court discovered that the board had incorrectly concluded all 604 claimants had received the replacement letter, accounting for the board's action ignoring the cessation of work stoppage issue. Because not all of the claimants had received the replacement letter, the court remanded the case to the board for a determination as to when the work stoppage had ended for these claimants.

Bridgestone has appealed the district court's ruling on two grounds. Bridgestone first contends the replacement letters did not sever the employment relationship as to the claimants who received them. Because the claimants never unconditionally offered to return to work until May 22, 1995, Bridgestone asserts they remained off work due to the

labor dispute and its consequent work stoppage and not because Bridgestone had severed the employment relationship. Therefore, Bridgestone argues, the board and the district court erred in concluding that section 96.5(4) did not disqualify these claimants from receiving unemployment benefits.

As to the second ground, Bridgestone contends there was not substantial record evidence that the work stoppage caused by the labor dispute ended on January 15, 1995, or at any time before the Union unconditionally offered to return to work on May 22, 1995. For that reason, Bridgestone asserts the ALJ erred in concluding that those claimants who had not received replacement letters were not disqualified under section 96.5(4) from receiving unemployment benefits.

### II. Scope of Review.

■■■ Our review is on error, and the agency's decision is binding on us if it is supported by substantial evidence and not based upon incorrect conclusions of law. Evidence is substantial when a reasonable mind could accept it as adequate to reach the same findings. We look only to the final agency decision and determine whether the record supports the agency's ruling. In reviewing a district court decision on the validity of agency action, we decide whether the district court has correctly applied the law. The district court itself acts in an appellate capacity to correct errors of law on the part of the agency. *Freeland v. Employment Appeal Bd.*, 492 N.W.2d 193, 196 (Iowa 1992) (citations omitted); *see* Iowa Code § 17A.19.

### III. Permanent Replacement of Striking Workers.

A. *Applicable law.* The first issue presented is whether the replacement letters to the claimants removed their disqualification for unemployment benefits under Iowa Code section 96.5(4). Resolution of this issue depends on our interpretation of section 96.5(4). Section 96.5(4) disqualifies workers from receiving unemployment benefits if

[f]or any week with respect to which ... the individual's total or partial unemployment is *due to a stoppage of work which*

*exists because of a labor dispute* at the factory, establishment or other premises at which the individual is or was last employed....

Iowa Code § 96.5(4) (emphasis added).

This provision models the "Draft Bill" prepared by the Committee on Economic Security in the 1930s. Milton I. Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L.Rev. 294, 294 (1949) [hereinafter Shadur]. Like many other states, Iowa adopted this provision to qualify for credits under the federal Social Security Act. *Id.* Consequently, a body of law has developed interpreting the key words for our analysis: "due to a stoppage of work which exists because of a labor dispute."

1. *Stoppage of work.* The disqualifying phrase "stoppage of work" found in the "Draft Bill" was based on the British Unemployment Insurance Act. *Id.* at 308. The British interpretation referred "not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed." *Id.* (quoting Ministry of Labour, Analytical Guide U.I.Code 7, Part III, § 43 (1939 ed.)). An overwhelming majority of appellate decisions in this country have adopted the same interpretation. *Id.* We have likewise adopted this interpretation. *See Crescent Chevrolet,* 429 N.W.2d at 151 (disqualifying phrase "stoppage of work" in Iowa Code section 96.5(4) "refers to the employer's operations and not ... to the efforts of the individual employees").

2. *Labor dispute.* Unlike "stoppage of work," the phrase "labor dispute" does not enjoy a settled meaning. Shadur, 17 U. Chi. L.Rev. at 300. Most of the state statutes employ the phrase "labor dispute" but with no definition of the phrase. *Id.* Section 96.5(4) is no exception. Like many states, this court has looked to the following definition of "labor dispute" in federal statutes:

The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions

of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

*Dallas Fuel Co. v. Horne,* 230 Iowa 1148, 1153, 300 N.W. 303, 306 (1941) (adopting the definition from the National Labor Relations Act but recognizing it was not bound to do so ); *see also* Shadur, 17 U. Chi. L.Rev. at 300 n. 26.

3. *Causation: labor dispute and stoppage of work.* As mentioned, section 96.5(4) imposes benefit ineligibility on an employee "[f]or any week with respect to which . . . the individual's . . . unemployment is *due to* a stoppage of work which exists *because* of a labor dispute. . . ." (Emphasis added.) With near unanimity, courts have interpreted the italicized words as

> inject[ing] a dual requirement of causality into the statute. Thus it is not sufficient for disqualification that the facts satisfy the definitions of "labor dispute" and "stoppage of work." Denial of compensation for any week depends on the additional finding that the stoppage exists because of the dispute during that week.

Shadur, 17 U. Chi. L.Rev. at 313.

Our case law likewise interprets section 96.5(4) as making benefit ineligibility dependent on two separate cause and effect determinations. First, it must be shown that the stoppage of work exists "because of a labor dispute." Second, it must be shown that the claimant's unemployment (for any week in which benefits are claimed) is "due to a stoppage of work." *Alexander v. Employment Appeal Bd.,* 420 N.W.2d 812, 814 (Iowa 1988); *accord Crescent Chevrolet,* 429 N.W.2d at 152.

Injecting causation into unemployment compensation cases

> has not meant importation of all the complexities of "proximate cause" doctrine into unemployment compensation. On the contrary, the decisions have escaped the difficulties of joint causation, concurrent causation, and intervening causation by adopting the relatively simple "but-for" rule: The work stoppage "exists because of a labor dispute" only if it would not have existed but for that dispute.

For example, the most common problem involves a stoppage due initially to a labor dispute. Later another factor appears which would alone be sufficient to cause a stoppage of work, and benefits are claimed for subsequent unemployment. Compensation has been uniformly allowed in such cases, whether the new causal element is the employer's decision to close down indefinitely, or to liquidate his business, the end of the normal season in a seasonal business, the making of repairs which would themselves have caused a shutdown, or the lack of supplies or orders necessary for operation.

Precisely the same "but-for" rationale has been applied where the stoppage was originally produced by nonlabor factors and a labor dispute has arisen during the stoppage. Benefits are consistently paid as long as the independent cause continues active, but disqualification occurs "for any week" in which the dispute becomes the sina qua non of the stoppage. These principles have carried so far as to allow compensation even where the initial cessation of work resulted from the employer's anticipation of the dispute.

Shadur, 17 U. Chi. L.Rev. at 313–15; *see also Gerst v. Marshall,* 549 N.W.2d 810, 815–17 (Iowa 1996) (suggesting, in tort cases, "but-for" test for causation in fact: defendant's conduct must have *in fact caused* the plaintiff's damages).

4. *Unemployment compensation and permanent replacement in general.* Unemployment compensation for permanently replaced strikers presents for us an issue of first impression. *Cf. Crescent Chevrolet,* 429 N.W.2d at 149 (addressing issue of "work stoppage" but not matter of workers "replaced" by supervisory and nonunion personnel); *Meyer v. Iowa Dep't of Job Serv.,* 385 N.W.2d 524, 525–26 (Iowa 1986) (involving "work stoppage" but not addressing issue of replaced strikers). Nationally, the issue has emerged with some frequency. A host of jurisdictions have confronted the matter, but with varying results. *See* 76 Am.Jur.2d *Unemployment Compensation* § 173, at 939–40 (1992) (noting some courts have allowed benefits for replaced workers because either the

employer-employee relationship was severed or the replacement ended any volitional nature on the employee's part for the unemployment and noting other courts flatly require an employee to offer to return to work unconditionally before allowed to receive benefits); Thomas J. Goger, Annotation, *General Principles Pertaining to Statutory Disqualification for Unemployment Compensation Benefits Because of Strike or Labor Dispute*, 63 A.L.R.3d 88, 208–15 (1975) (collecting cases).

a. *Other jurisdictions' approaches.* Two cases, one from Wisconsin and the other from Minnesota, form the principal authority for continuing the labor disqualification until an employee offers to return to work unconditionally. Bridgestone relies heavily on both. The seminal authority for denial of benefits comes from the Wisconsin Supreme Court which held that replacement of striking workers alone did not terminate the employer-employee relationship. *Rice Lake Creamery Co. v. Industrial Comm'n*, 15 Wis.2d 177, 112 N.W.2d 202, 205 (1961). The court explained the rationale for its rule:

> In the case of replacement of striking employees with other workers when there is no affirmative action on the part of the employer to discharge any particular striker, it would seem that discharge or termination of the employee-status of the strikers for the purpose of unemployment compensation should not and cannot be determined until the active progress of the dispute had ended. Then those striking employees offering to return to work, but not accepted by the employer, become eligible for unemployment benefits on the theory that at that time they are discharged, their employee-status terminated and, consequently, their unemployment from actual work or service is then no longer attributable to the strike.

*Id.* at 206–07.

Taking its cue from *Rice Lake*, the Minnesota Supreme Court construed its similar statute to require continued disqualification of benefits for striking workers who were replaced without notification and never offered to return to work. *Johnson v. Wilson & Co.*, 266 Minn. 500, 124 N.W.2d 496, 504

(1963). The court noted that it had the so-called "Wisconsin" or "active progress" type statute in which the worker is disqualified only if a strike or other labor dispute is in active progress. *Id.* at 502–03. Under such a statute, benefits are usually denied during the continued existence of the labor dispute. *Id.* at 503. Under the Minnesota statute the disqualification could be removed if, for example, the employer unequivocally discharged a striking employee who agreed to such discharge. *Id.* The court found that there was such a discharge but it was not the "direct and proximate cause" of each claimant's unemployment after the date of the termination notice. *Id.* at 504. Rather the court found that the claimants remained away from work voluntarily because they refused the employer's offer to return to work before the termination notice went out. *Id.*

In the course of its discussion, the court in *Johnson* noted that its "active progress" statute is one of two types of statutes dealing with disqualification for unemployment benefits because of a claimant's involvement in a labor dispute. *Id.* at 502. According to the court, the other statute—the so-called "work stoppage" statute—disqualifies the worker "unless the unemployment for which he seeks compensation can be reasonably attributed to *any cause other than* the labor dispute and its consequent work stoppage at his place of employment." *Id.* at 503 (emphasis added).

Other courts have followed the lead of Wisconsin and Minnesota. These courts generally require a striking employee to abandon the labor dispute and offer to return to work without condition. *See, e.g., Building Prods. Co. v. Arizona Dep't of Econ. Sec.*, 124 Ariz. 437, 604 P.2d 1148, 1152 (1979) (noting even division of authority among courts addressing effect of permanent replacement on unemployment benefits); *Salazar v. New Mexico Employment Sec. Div.*, 115 N.M. 54, 846 P.2d 1063, 1065 (1993) (holding "[w]here striking employees make no attempt to gain reemployment during the dispute, and absent a denial of reemployment by the employer or other unequivocal notice or act by the employer terminating the strik-

ers' employment," the claimant is disqualified from receiving benefits); *Texas Employment Comm'n v. Riddick,* 485 S.W.2d 849, 853 (Tex.Civ.App.1972) (holding substantial evidence supported commission conclusion that replaced worker was unemployed "due to" a labor dispute when he did not actively seek work from the employer during the strike).

Other courts, often relying on "work stoppage" provisions identical or similar to the "Draft Bill," hold that notified, permanently replaced workers are eligible for unemployment benefits. The leading case is *Canonsburg,* the principal authority on which the board relied. 156 Pa.Cmwlth. 533, 628 A.2d 503, 510 (1993), *aff'd,* 540 Pa. 531, 658 A.2d 790, 790 (1995). The case holds that permanent replacement severs the employer-employee relationship and, under the "due to a work stoppage" statutory disqualification, the claimant's unemployment can no longer be said to have been caused by the labor dispute and its consequent work stoppage. *Id.* Under this ruling, claimants are not required to make an unconditional offer to return to work to qualify for benefits. *Id.* The rationale for the rule is that where the employer-employee relationship is permanently severed, the employee no longer has any real interest in the outcome of the labor dispute. *Id.* (relying on *Penflex v. Bryson,* 506 Pa. 274, 485 A.2d 359, 366–67 (1984)). Thus, the dispute is not the immediate cause of the unemployment and for that reason the unemployment disqualification is removed. *Id.*

*Canonsburg* also makes clear that absent any evidence in the record that continuing work remains available to the striking workers, the case must be considered as one where the employment relationship has been severed. *Id.* In these circumstances, eligibility is to be decided under a disqualification provision for willful misconduct. *Id.* Finally, the court put the burden on the employer to

> show that it advised the striking employees that despite the hiring of permanent replacements work was still available to them ... [and] that should the employer choose to replace only some employees the burden is on it to demonstrate what employees it is replacing as that information is solely within its knowledge. Should [the employer] fail in its burden, benefits will be due all employees.

*Id.*

The Indiana Court of Appeals has similarly interpreted its disqualifying labor dispute statute. *See Arvin N. Am. Automotive v. Review Bd.,* 598 N.E.2d 532, 537 (Ind.Ct.App. 1992). The court rejected the employer's argument that the striking workers had the burden to show not only their permanent replacement but also the unavailability of work caused by their replacement. *Id.* In doing so, the court said:

> The permanent replacement of a striking worker by an employer realistically presupposes the work he or she once performed is no longer available to that worker. "Permanent replacement" and "unavailability of work" are not terms of art but are rather concepts grounded in the practical concerns entailed in making a determination whether, pursuant to statute, the employment of striking workers has been terminated. We decline Employers' invitation to burden these concepts in an unduly technical fashion that is neither realistic nor comports with existing case law. For example, the permanent replacement of an employee may not be "permanent" at all. We have previously observed the "phrase 'permanent replacement' requires neither that the replacement employees eternally remain with the company nor that the striking employees be eternally barred from any further employment with the company." Likewise, the phrase "unavailability of work," which is often an important factual focus in cases where termination by permanent replacement is an issue, refers to the distinction between a "temporary" and "permanent" replacement.

*Id.* (citations omitted).

Recognizing that "unavailability of work" is inherent in the term "permanent replacement," the court went on to hold that once employees are permanently replaced their employment is terminated and benefit disqualification is removed. *Id.* While claimants were still required to show they were replaced, the court held that their burden to prove termination is fully satisfied by such a

showing. *Id.* "To rule otherwise," the court concluded, "would require a striking employee to make an unconditional offer to return to work in order to test the permanency of the replacement," a proposition the employer argued but which the court rejected. *Id.* The requirement of an unconditional offer to return to work, the court noted, would (1) make a nullity of the statutory provision allowing the employer to terminate the employment relationship and (2) constitute an effective end to the strike, which is a separate statutory ground for removing the labor dispute disqualification. *Id.*

Other courts have, for varying reasons, concluded that permanent replacement severs the causal connection between the unemployment and the labor dispute thereby removing the bar to unemployment benefits. *See, e.g., Ruberoid Co. v. California Unemployment Ins. Appeals Bd.*, 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102, 105 (1963) (applying a two-part test for determining whether permanently replaced workers remained disqualified from receiving unemployment benefits: first prong of test inquires into whether the worker's unemployment was voluntary or volitional; second prong inquires into whether the labor dispute or the employer's actions was the cause of the unemployment); *Federico v. Brannan Sand & Gravel Co.*, 788 P.2d 1268, 1271 (Colo.1990) (holding that whether the employer-employee relationship has been severed is a fact question and an offer to return to work and a refusal to accept the work are not prerequisites to a finding of termination); *Plymouth–Stamping, Div. of Eltec Corp. v. Lipshu*, 436 Mich. 1, 461 N.W.2d 859, 875 (1990) (holding that actual permanent replacement of striking employees ends the "cause" of their original unemployment); *Wohlert Special Prods. v. Michigan Employment Sec. Comm'n*, 202 Mich.App. 419, 509 N.W.2d 825, 828 (1993) (clarifying that the rule in Michigan is that the striking employees must be actually permanently replaced before one can say the *cause* of the claimant's unemployment is no longer the work stoppage) *vacated,* 447 Mich. 1022, 527 N.W.2d 514, 514 (1994) (remanding to agency for fact-finding on availability of work); *Mississippi Employment Sec. Comm'n v. Sanderson Plumbing Prods.,*

*Inc.,* 604 So.2d 215, 217 (Miss.1992) (holding permanent replacement alters the cause of the claimant's unemployment and striking worker "is then out of work because of something over which he has no control"); *Baugh v. United Tel. Co.*, 54 Ohio St.2d 419, 377 N.E.2d 766, 770 (1978) ("[S]ince the employer's action of permanent replacement prevented any volition on the part of the workers to return to work and since it severed the labor dispute as the cause of unemployment," the "due to a work stoppage" statutory disqualification acted as no bar to unemployment benefits); *Skookum Co. v. Employment Div.*, 24 Or.App. 271, 545 P.2d 914, 916 (holding that where work was not available the strikers' unemployment after their replacement was not due to a "labor dispute" but, rather, it was because the employer had no work available), *aff'd,* 276 Or. 303, 554 P.2d 520 (1976).

The Alabama Supreme Court has attempted to make sense of the inconsistent decisions among the nation's courts in this area. *See Ex parte Williams,* 646 So.2d 22, 24 (Ala.1994). There, the court observed, like the Minnesota court in *Johnson,* that states have adopted one of two general kinds of labor dispute disqualification statutes: the "due to work stoppage" statute and the "labor dispute in active progress" statute. *Id.* In researching the states' labor dispute statutes and reported decisions, the court noted states with "due to work stoppage" statutes generally found permanent replacement sufficient to remove the benefit disqualification. *Id.* Conversely, courts in states with "labor dispute in active progress" statutes—a much broader disqualification—held that permanent replacement alone did not remove the disqualification. *Id.* The court was forced to recognize, however, that states with substantially the same language in their statutes gave entirely different meanings to them. *Id.*

b. *Iowa's approach.* We begin our analysis by first noting that Iowa has a "stoppage of work" statute. Jurisdictions with such statutes and which recognize the permanent replacement rule reason that the employer's replacement of striking workers terminates their status as employees. Thus, an employ-

er-employee relationship is an essential element of a "labor dispute" for purposes of unemployment compensation benefits. *See, e.g., Arvin,* 598 N.E.2d at 537 ("[A]n employer's act of permanently replacing striking workers severs the employer-employee relationship thereby removing the statutory labor dispute disqualification."); *Jackson v. Review Bd.,* 138 Ind.App. 528, 215 N.E.2d 355, 359 (1966) (" 'It seems obvious to us that the term "labor dispute" necessarily implies the existence of the relationship of employer and employee.' ").

Iowa Administrative Rule 345—4.34(3), which the board relied on, incorporates the concept that an employer-employee relationship is an essential element of a labor dispute for purposes of unemployment compensation benefits. It provides:

> The relationship between employer and employees continues during the period of the labor dispute unless severed by the employer or employee.
>
> a. If the relationship is severed by the employer, Section 96.5(2) concerning discharge for misconduct shall govern.
>
> b. If the relationship is severed by the employee, Section 96.5(1) concerning voluntary leaving shall govern.

Critical to the "work stoppage" jurisdictions employing the permanent replacement rule is the concept of causation. When the employer-employee relationship is permanently severed, the employee no longer has any real interest in the outcome of the labor dispute. *Canonsburg,* 628 A.2d at 510. Thus the dispute is not the immediate cause of the unemployment. *Id.* The question then becomes whether the employee was fired for misconduct. *Id.*

As mentioned, language in section 96.5(4) and our case law make clear that causation is a focal point in determining unemployment benefit disqualification. Additionally, rule 345—4.34 inferentially incorporates the causation requirement by mandating the provisions for misconduct govern when the employer severs the employment relationship.

The important question is this: When is the employment relationship severed? We think the approach to this question taken by the courts in *Canonsburg* and *Arvin* provides a reasonable answer: the employee is permanently replaced thereby severing the employment relationship when no continuing work remains available to the striking worker. *Arvin,* 598 N.E.2d at 537 ("The permanent replacement of a striking worker by an employer realistically presupposes the work he or she once performed is no longer available to that worker."); *Canonsburg,* 628 A.2d at 510 ("[W]here an employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be considered as one where the employment relationship has been severed."); *cf. Aluminum Co. of Am. v. Employment Appeal Bd.,* 449 N.W.2d at 395 (Iowa 1989) (noting question of whether lay-off or lockout occurred turns on employer's notice to employees of availability of work).

■ We adopt the approach taken by *Canonsburg* and *Arvin.* We now hold that for purposes of section 96.5(4) and rule 345—4.34(3) the employment relationship is severed when there is no record evidence that continuing work remains available to the claimant. We impose on the employer the burden to show that it advised the claimant that despite the hiring of permanent replacements work was still available to them. Even if such work is available, failure to so advise the claimants will result in removing the section 96.5(4) disqualification. In those circumstances, the labor dispute and its consequent work stoppage is no longer the cause of the claimants' unemployment.

■ Additionally, the claimant need not make an unconditional offer to return to work as proof that the claimant has been permanently replaced. Such a requirement would make a nullity of rule 345—4.34(3)(a) which gives the employer the option to terminate the employment relationship, but in doing so the employer removes the labor dispute disqualification. *See Arvin,* 598 N.E.2d at 537.

In sum, when an employer permanently replaces striking workers, it thereby severs the employment relationship unless the em-

ployer can show work remained despite the replacement and the claimant was so advised.

The purpose of our unemployment compensation law is to protect from financial hardship workers who become unemployed through no fault of their own. *See* Iowa Code § 96.2. We are to construe the provisions of that law liberally to carry out its humane and beneficial purpose. *Dirksen v. Employment Appeal Bd.,* 477 N.W.2d 381, 382 (Iowa 1991). Conversely, we are to interpret strictly the law's disqualification provisions, again with a view to further the purpose of the law. *See Diggs v. Employment Appeal Bd.,* 478 N.W.2d 432, 434 (Iowa App.1991). The approach we take is faithful to the underlying purpose of the law and the principles we follow in interpreting it.

The labor dispute disqualification provision in section 96.5(4) "expresses a legislative policy of neutrality in labor disputes and, in furtherance of this policy, does not require an employer to fund a strike against itself through unemployment compensation." *Federico,* 788 P.2d at 1271. It is true that

[w]hile a striking employee is involved in a labor dispute, the state's policy of neutrality is furthered by the denial of unemployment compensation to the employee. However, after the employer-employee relationship is terminated [by the hiring of replacement workers for striking employees], the policy of state neutrality in labor disputes is no longer implicated and the policies underlying [the unemployment compensation law] as a whole are furthered by an award of unemployment benefits.

*Id.*

That brings us to the merits of this case.

**B.** *The merits.* The board found that the claimants were initially involved in a labor dispute. The board further found that when Bridgestone sent permanent replacement letters to the claimants, Bridgestone changed the relationship and discharged the employees. In effect, the board was saying that Bridgestone had severed the employment relationship thereby triggering rule 345—4.34(3)(a) ("If the relationship is severed by the employer, Section 96.5(2) con-

cerning discharge for misconduct shall govern."). The board further found that Bridgestone had neither alleged nor presented any evidence of misconduct on the part of the claimants. The board therefore concluded that the claimants were discharged for no disqualifiable reason and were eligible for unemployment benefits.

In accordance with rule 345—4.34(3)(a), the board in effect made a finding that through the replacement letter Bridgestone had severed the employment relationship between it and those claimants who had received the letter. There is substantial record evidence to support this finding. The letter begins by notifying the claimants that they "had been permanently replaced." The words "permanently replaced" imply there is no work for the claimant receiving the letter. Reading the remainder of the letter, the ordinary employee could form no other conclusion but that his or her relationship with Bridgestone was severed and no work was available.

In addition, there is no record evidence that there was any work remaining available for the claimants. The only evidence on this point is in the letter itself and, at most, that evidence is equivocal. On this point, the letter states: "if there are no vacancies in your position, you will be placed on the preferential hiring list, and will be offered reinstatement to your previous position or a substantially equivalent position as such vacancies arise."

Implicit in the board's finding that the employment relationship had been severed is the further finding that at the time the letter was received the cause in fact of the claimants' unemployment was not the labor dispute and its consequent work stoppage. Rather, the cause was the employer's action in severing that relationship. The evidence we discussed supporting the severance of the employment relationship likewise supports this finding of causation. In addition, Bridgestone had the burden to show that it had advised the claimants that despite the hiring of permanent replacements work was still available to them. The letter makes no mention of this and there is no other record evidence of such notification. Faced with

this information, we can hardly say the employees' unemployment remained volitional.

For all of these reasons, we conclude the board and the district court were correct in their conclusion that the claimants who had received the permanent replacement letter were not disqualified from receiving benefits under the provisions of section 96.5(4). No issue has been raised as to the board's finding that there was no evidence to support a misconduct disqualification. The board and the district court were therefore correct in concluding that these claimants should receive unemployment benefits.

## IV. *The Cessation of Work Stoppage Issue.*

As mentioned, the board incorrectly concluded all 604 claimants had received the replacement letter. This accounted for the board's action ignoring the cessation of work stoppage issue. Because not all of the claimants had received the replacement letter, the district court remanded the case to the board for a determination as to when the work stoppage had ended for these claimants. We conclude the district court was correct in remanding the case for findings and a determination on this issue.

Contrary to Bridgestone's insistence, neither the district court nor we have original authority to make findings of fact and declare the parties' rights. *Taylor v. Iowa Dep't of Job Serv.*, 362 N.W.2d 534, 537 (Iowa 1985). In circumstances where the agency does not make such findings and declare such rights, a remand is necessary for those findings and declaration. *Id.*

## V. *Disposition.*

In sum, we conclude there was substantial record evidence to support the board's finding that (1) Bridgestone severed the employment relationship as to those claimants who received the replacement letter and (2) this action—rather than the labor dispute and its consequent work stoppage—was the cause of their unemployment. We therefore affirm on this issue as to these claimants. We also affirm the award of their benefits.

The district court correctly remanded the case to the board for a determination of when the work stoppage had ended as to those claimants who did not receive the replacement letter. Implicit in the remand order is the district court's reversal of the board's decision awarding unemployment compensation to these claimants. The reversal and remand were correct. We therefore affirm the district court's order on this issue.

**AFFIRMED.**