(No. 44070.—)

H. R. TRAVIS *et al.,* Appellees, v. BARNEY J. GRABIEC, Director of Labor, *et al.,* Appellants.

*Opinion filed May 22, 1972.—Rehearing denied September 29, 1972.*

GOLDENHERSH, J., took no part.

WILLIAM J. SCOTT, Attorney General, of Springfield, and SCHLAFLY, GODFREY & FITZGERALD, of Alton (FRANCIS T. CROWE, HERMAN R. TAVINS and A. ZOLA GROVES, Assistant Attorneys General, and J. F. SCHLAFLY, of counsel), for appellants.

JOHN DALE STOBBS, of Alton, for appellees.

THOMAS J. BOODELL, WAYLAND B. CEDARQUIST, and MARK R. FERDINAND, all of Chicago, for Illinois Manufacturers' Association, *amicus curiae*.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

This case is here upon leave granted to appeal from a judgment of the Appellate Court, Fifth District. (130 Ill.App.2d 886.) It involves the interpretation of the phrase "stoppage of work" as it relates to the eligibility of striking employees for benefits under the Unemployment Compensation Act.

On August 18, 1962, about 2070 of the 3000 employees of Shell Oil Company at its Wood River plant went on strike; they did not go back to work until February 3, 1963. In administrative proceedings under the Act, the Director of Labor found that the work stoppage continued from August 18, 1962, to February 3, 1963,

and that no unemployment compensation benefits were payable. In this administrative review action the circuit court of Madison County first affirmed the Director's determination, but thereafter, on motion of the employee plaintiffs, modified its order and remanded the case to the Director for the taking of evidence relating to the "resumption of substantial production during any period of the strike."

Pursuant to the order of remand, a further administrative hearing was had. The second decision of the Director stated that there was "sufficient evidence to warrant a finding that by December 27, 1962, the company was producing 175,000 barrels of its product, which was substantially the same daily thru-put as was achieved prior to the strike and during periods when all workers were at their regular jobs." The Director also stated, however, that by this finding he did "not intend in any way to indicate his concurrence in or acceptance of this standard for determining the cessation of a stoppage of work under the statute," and expressed his opinion that the correct standard for that determination was that stated by this court in *Abbott Publishing Co. v. Annunzio (1953), 414 Ill. 559.* He again decided that the claimants were ineligible for benefits.

Section 604 of the Unemployment Compensation Act (Ill.Rev.Stat. 1971, ch. 48, par. 434) provides: "Labor Dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed ***."

The Director denied benefits because he was "of the opinion that the correct standard for determining the cessation of a stoppage of work is as dictated in the three-fold test announced by the Supreme Court" in *Abbott Publishing Co. v. Annunzio (1953), 414 Ill. 559.*

There the court said: "Briefly stated, the majority rule holds that where the employer has permanently replaced all the employees whose employment was terminated in the course of a labor dispute, has fully resumed its normal plan of operations and resumed previous production, then the unemployment of its former employees is no longer due to a stoppage of work because of a labor dispute at the employer's plant." (414 Ill. 559, at 566.) The Director interpreted this passage to impose three conditions to the ending of a work stoppage. Specifically, he found through his representative that there had not been (1) a permanent replacement of the claimants or (2) a termination of the claimants' unemployment or (3) a resumption of normal operations.

On the other hand, in reversing the decision of the Director, the trial judge held: "When Shell Oil Company, by whatever methods used inside its own plant, reached substantially normal production on December 27, 1962, the stoppage of work due to a labor dispute ended, and since the production record continued at substantially normal production until the end of the strike on February 2, 1963, the remaining eligible employees of the 450 claimants are entitled to benefits from December 27, 1962 to and including February 2, 1963." The appellate court affirmed this ruling.

The difference between the Director and the circuit and appellate courts concerns the test to be applied in determining when a work stoppage has ended. The Director emphasizes a return to *full normal operations,* while the trial court is concerned only with *substantially normal production, by whatever methods obtained,* so long, apparently, as work is not farmed out.

The parties have cited several decisions by courts in other jurisdictions which involve somewhat similar factual situations. Differing results were reached in those cases, which illustrate some of the many problems that have arisen in the construction of unemployment compensation

statutes. *Meadow Gold Dairies-Hawaii Ltd. v. Wiig (1968), 50 Hawaii 225, 437 P.2d 317; General Electric Co. v. Director of the Division of Employment Security (1965), 349 Mass. 358, 208 N.E.2d 234; Cumberland & Allegheny Gas Co. v. Hatcher (1963), 147 W.Va. 630, 130 S.E.2d 115; Inter-Island Resorts v. Akahane (1962), 46 Hawaii 140, 377 P.2d 715; Monsanto Chemical Co. v. Thornbrough (1958), 229 Ark. 362, 314 S.W.2d 493; Producers Produce Co. v. Industrial Com. of Missouri (Mo.App. 1955), 281 S.W.2d 619.*

In our opinion, both the position asserted by the Director and that expressed by the trial and appellate courts are too doctrinaire to conform to the intention of the legislature. The Director's position is based upon a literal reading of our opinion in the *Abbott Publishing Co.* case. That opinion involved a situation in which all of the striking employees had been permanently replaced and full production was being achieved by fully normal methods of operation. It was therefore held that the former employees who had gone on strike were entitled to unemployment compensation benefits. But that opinion, like all others, must be read in terms of the facts that evoked it, and the observations of the court in that case were not intended to, and did not, exhaust the circumstances under which a work stoppage might be terminated so that compensation benefits would be payable.

We are also of the opinion that the position taken by the trial court, which looks only at gross production without regard to the means by which that production is achieved or the continuing disruption of the normal operating methods of the employer, does not reflect the intention of the legislature. Since there is no single pattern or mold which can confine all aspects of all of the varied types of industrial and commercial enterprise and all of the labor disputes in which they and their employees may become involved, it is not surprising that it is difficult to capture all of the variables in a single

word or phrase. It may be that there are some situations in which normal operations can be measured accurately enough in terms of gross production. But there are other situations in which a myopic concern with production to the exclusion of the consideration of all other aspects of the enterprise can result in gross distortion.

The scholars who have examined the problem have not excluded from consideration the means by which production is achieved during a labor dispute:

"Since the mid-fifties, there has been a new emphasis placed upon the term 'operations.' As production increasingly represents less than totality of the employing unit's performance, decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and construction activities have come to the fore as indicia of substantialness." Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence (1967), 45 Journal of Urban Law 319, 332.

"Several problems are presented by the majority criterion of stoppage at the place of employment. First the theoretical justifications for the requirement are plainly applicable even though a *complete* cessation of operations does not exist. There has consequently been unanimous acceptance, both under the British Acts and in this country, of the proposition that a *substantial* curtailment is sufficient to disqualify claimants. Less unanimity exists, of course, as to the meaning of 'substantial.' Although most decisions follow the general practice of examining decreased production, business revenue, service, number of employees, payroll, or man-hours, seemingly inconsistent results are bound to ensue from the great variety of fact situations presented. As long as the bases for decision are correct, however, an occasional aberration is small cause for alarm.

"More troublesome has been the question of whether benefits are payable during disputes which cause a substantial production drop in one department, though not in the entire plant. Twenty-eight of the thirty-four 'stoppage of work' statutes provide that if 'separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate

factory, establishment, or other premises.' The implication is that departments which are *not* 'commonly conducted as separate businesses in separate premises' do not possess independent status for the purpose of determining disqualification. The test should thus be whether the stoppage was substantial in relation to the *entire* establishment's production, not merely to that of the department in which the dispute occurred. This approach would be harmonious with the view that benefits should depend in part upon the likelihood of success of the employees' strike. However, due perhaps to the pervasive influence of the 'involuntary loss of work' theory, the decisions are in hopeless conflict.

"Several administrators have been faced with the difficult situation in which the normal production-crippling effect of a strike has been averted by a temporary work rearrangement by the employer. The principle of 'probable strike success' indicates that decisions should turn on whether the work can continue permanently on the new basis or whether the employer will be compelled to rehire to replace the strikers. Once again the decisions are not fully consistent with this or any other theory, and it is fortunate that the problem arises only infrequently." Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification (1949-1950), 17 U. Chi. L. Rev. 294, 310-312.

The first opinion of the trial judge contained this summary of the evidence:

"The evidence without dispute showed that 2070 hourly employees, who were in a group comprising 13 different unions, were on strike which started on August 18, 1962. The uncontradicted evidence shows that operations were curtailed in many different respects; that 700 salaried employees out of a staff of 940 left their jobs and took over certain production facilities, but not all of such facilities, and that said work, including that of maintenance and repair, was done by 2070 hourly employees; that work was deferred in the following departments, Combine, Lube oil, Refinery Laboratory, Treatment and Research; construction work was halted; transportation of products by truck and barge practically terminated. It is therefore apparent, and a significant factor, that operations were severely curtailed and that in the Court's opinion 'stoppage of work' refers not only to production, but to operations."

In our opinion the following conclusions expressed by

the trial judge in his initial opinion correctly construed the statute:

> "[W]hen the employer regained production to a point where business operations are substantially normal, then stoppage of work ends. Normal operations would mean that conforming to the standard, or regular operation of the employer's plant. Even though for a period of time full production was carried on by a skeleton force working abnormal hours and performing abnormal functions, this certainly could not mean normal operation. To hold otherwise, would require this Court to say that the employer did not need the 2070 employees, or need the existing facilities that were not being used, nor to maintain or replace its equipment. The Court is of the opinion that 'stoppage of work' ends when the employer's business operations returns to substantially normal operations."

The judgments of the circuit and appellate courts are therefore reversed, and the cause is remanded to the circuit court of Madison County with directions to confirm the decision of the Director.

*Reversed and remanded, with directions.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.