UNION STARCH & REFINING COMPANY, INC., Plaintiff-Appellee, *v.* THE DEPARTMENT OF LABOR *et al.*, Defendants-Appellants—(LOUIS E. ALDRIDGE *et al.*, Plaintiffs-Appellants, *v.* THE DEPARTMENT OF LABOR *et al.*, Defendants-Appellees.)

(Nos. 67-128, 67-129 cons.;

Fifth District—February 19, 1970.

*Modified on denial of rehearing November 6, 1972.*

William J. Scott, Attorney General, of Chicago, (Francis T. Crowe and Herman R. Tavins, Assistant Attorneys General, of counsel,) for appellant Department of Labor in No. 67-128. William G. Clark, Attorney General, of Chicago, (John J. O'Toole and Phillip Appel, Assistant Attorneys General, of counsel,) for appellee Department of Labor in No. 67-129.

Lance Callis and George Filcoff, Jr., both of Granite City, for appellant Lowell J. Allison *et al.*, in No. 67-128 and appellant Louis E. Aldridge *et al.*, in No. 67-129.

Randall Robertson, of Granite City, for appellee Union Starch & Refining Co. in Nos. 67-128 & 67-129.

Mr. JUSTICE GOLDENHERSH delivered the opinion of the court:

In cause No. 67-128, a group of 30 employees of Union Starch & Refining Company, Inc. appeal from the judgment of the Circuit Court of Madison County reversing the decision of the Director of the Department of Labor. In cause No. 67-129, a group of approximately 400 employees of Union Starch & Refining Company, Inc. appeal from the judgment of the Circuit Court of Madison County affirming the decision of the Director of the Department of Labor. The employees involved in 67-128 will hereafter be referred to as "security employees", those in 67-129 will be called "production employees", Union Starch & Refining Company, Inc. will be called "Union Starch" and the Director of the Department of Labor will be referred to as the "Director". Although separate appeals were taken we have consolidated the cases for opinion.

As the result of a labor dispute between Union Starch and Local 7-663 of the Oil, Chemical and Atomic Workers Union, hereafter called the "Union", there was a strike in Union Starch's Granite City plant which commenced on July 4, 1965, and lasted through January 29, 1966.

The production and security employees filed claims for unemployment compensation. Testimony adduced at hearings before the representative

of the Director shows that prior to July 4, 1965, Union Starch, at its Granite City plant, employed 430 hourly employees, all of whom are members of the Union, and 181 salaried employees. On that date the Union called a strike and established a picket line.

During the strike no one was hired to replace the hourly production workers. 135 salaried employees were taken from their regular positions and put into operations normally performed by hourly workers. Production is "budgeted" on the basis of anticipated sales and during the strike the production of corn syrup was 82% to 85% of the budget for the period, and starch was produced at approximately 78% of budget. The production crews worked two twelve hour shifts, six days per week. Substantially normal production, quantitatively, was achieved by July 24, 1965. Research, planning and building were virtually suspended, and maintenance suffered. Upon termination of the strike the hourly employees were invited to return to work and the salaried employees returned to their pre-strike assignments.

Article XVI, Section 21 of the agreement between Union Starch and the Union provides:

"If, at any time, the Union is going to use its strike privileges under the terms of this Agreement, the Union and the Company shall discuss the work assignments of clock carriers and power house employees in order to continue the protection of the plant and plant property."

The Union sought to discuss the work stoppage of these employees (the 30 individuals referred to as "security employees") and Union Starch stated they were not needed. Throughout the strike Union Starch utilized the services of temporary personnel supplied by The Pinkerton Agency on a contract basis.

The Director found that the production employees were unemployed from July 4, 1965 to January 29, 1966, as the result of a stoppage of work caused by a labor dispute, they voluntarily withdrew their services during the period and were directly interested in the labor dispute, and held them ineligible for unemployment benefits during this period.

With respect to the security employees, the Director found that there was a stoppage of work due to a labor dispute that commenced on July 4, 1965, that their unemployment subsequent to July 24, 1965, did not result from a labor dispute "since their jobs had ceased to exist through a readjustment of operations and the permanent replacement of most of the strikers", and held them eligible for benefits after July 24, 1965.

Administrative review was sought, the circuit court reversed the Director's decision with respect to the security employees (cause No.

67-128), affirmed his decision finding the production employees ineligible for benefits (67-129), and these appeals followed.

■■ Because of the circumstances under which the actions for Administrative Review were instituted all parties have briefed and argued both sides of the propositions that under the Administrative Review Act the findings and conclusions of the Director on questions of fact are *prima facie* true and correct (Ch. 110, sec. 274, Ill. Rev. Stat.; *Rotella v. Civil Service Commission of the City of Chicago*, 75 Ill.App.2d 81), and the circuit court can set aside the findings if they are against the manifest weight of, or without substantial foundation in, the evidence. From our examination of the record we find the facts are not in dispute and the rules above reviewed are not applicable. *Puttkammer v. Industrial Com.*, 371 Ill. 497; *Fransen Const. Co. v. Industrial Com.*, 384 Ill. 616.

The statute pertinent to this controversy is section 604 of the Unemployment Compensation Act (Ch. 48, sec. 434, Ill. Rev. Stat.), which provides in part:

> "Labor Dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided, that this Section shall not apply if it is shown that (A) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; * * *"

No contention is made that the security people are not of the same "grade or class of workers" as the production employees. Appellants' principal contentions are that the term "stoppage of work" as used in the statute refers to a stoppage of work at the place of employment and not that of the individual worker; that the stoppage of work ended on July 24, 1965, when production at Union Starch's plant became "substantially normal" and all of the appellants became eligible for benefits on that date.

*Abbott Publishing Co. v. Annunzio*, 414 Ill. 559, supports appellants' first argument, and the record shows that Union Starch's production was substantially normal after July 24, 1965.

The issue, very narrowly presented, is whether the termination of the stoppage of work requisite to make appellants eligible for benefits oc-

curred upon resumption of substantially normal production, or whether such resumption must have resulted from restoration of prior normal procedures, replacement of the employees, or a change in the method of operation.

Although we find guidance in several cases hereafter discussed, the precise issue presented has not been decided by a court of review in Illinois.

In *Cumberland and Allegheny Gas Co.* (Supreme Court of Appeals, W.Va. 1963), 130 S.E.2d 115, all of the company's 79 hourly paid employees ceased to work, and their duties were performed by 17 supervisory and promotional employees. Although some activities were curtailed, and some customers were billed on an estimated basis because meters were not read, the flow of gas remained approximately normal. The court held that a "stoppage of work" means a substantial curtailment of the employer's normal operations, and since none was shown, the claimant employees were eligible for benefits.

In *Monsanto Chemical Co. v. C. R. Thornbrough* (Supreme Court of Arkansas, 1958) 314 S.W.2d 493, 91 supervisory employees maintained "roughly the equivalent of normal production" while 339 production employees were on strike. Rejecting the employer's contention that the stoppage of work continued until the plant's production was normal in every respect, the court held the stoppage ends "when the employer regains production to a point at which his business operations are substantially normal". The court observed, "It is of course apparent that if a resumption of completely normal operations were required, the employer could continue the stoppage indefinitely by leaving a small department of his plant idle." l.c. 496.

In *Meadow Gold Dairies—Hawaii Ltd. v. Wiig* (Supreme Court of Hawaii 1968), 437 P.2d 317, during a strike, the dairies' business operated at 82% of normal production by utilization of its non-union regular employees and temporary employees, although home deliveries stopped. The court held there was no stoppage of work which made the claimant-employees ineligible for benefits.

In *General Electric Co. v. Director of Div. of Emp. Sec.* (Supreme Judicial Court of Mass., 1965), 208 N.E.2d 234, certain work was transferred to an outside shop because of a strike by the plant's welders. By farming out the work the employer suffered no disruption of delivery of its products. The issue presented was whether the claimant's unemployment resulted from the stoppage of work caused by the labor dispute or from the transfer of the work to outside sources. The court held the farming out of the work resulted from the employer's being

prevented from doing the work in its usual manner, and the period of unemployment, therefore, was the result of the work stoppage.

In *Abbott Publishing Co. v. Annunzio (supra)*, the evidence showed that by July 10, 1948 the employer had replaced the striking employees to the extent that it employed the same number of employees in its composing room which were normally employed prior to the strike, and these employees were paid at the rate prevailing on the date the employees left their jobs. The court held the stoppage of work caused by the strike terminated as of that date (July 10, 1948) and the employees were eligible for benefits. At page 566, the court said:

> "Briefly stated, the majority rule holds that where the employer has permanently replaced all the employees whose employment was terminated in the course of a labor dispute, has fully resumed its normal plan of operations and resumed previous production, then the unemployment of its former employees is no longer due to a stoppage of work because of a labor dispute at the employer's plant."

Subsequently, upon quoting from its opinion in *American Steel Foundries v. Gordon*, 404 Ill. 174, the court at page 568, said, "The extension of our foregoing language to its logical conclusion would apparently support the majority rule."

In *Shell Oil Co. v. Cummins*, 7 Ill.2d 329, at page 335, the court said:

> "Although we have held that a labor dispute, within the meaning of this act, may continue even after the signing of a working agreement (*American Steel Foundries v. Gordon*, 404 Ill. 174,) this disability terminates upon the resumption of normal production activity. *Abbott Publishing Co. v. Annunzio*, 414 Ill. 559."

We interpret these statements to mean that in order that there be cessation of a stoppage of work resulting from a labor dispute it is not sufficient to show substantially normal production, however achieved, but that there must be either replacement of the employees involved, or full resumption of the employer's normal plan of operations and substantially normal production. By this statement we do not purport to exclude, where the facts warrant, the possibility of termination by a permanent change in production methods, farming out of the work, discontinuance of a product, or many other situations which might conceivably arise.

Mindful of the admonition of the court in *Monsanto Chemical Co. v. Thornbrough*, we are of the opinion that the test as enunciated in the West Virginia, Arkansas and Hawaii cases above discussed is preferable to that which we have here applied. However, in view of the language in *Abbott Publishing Co. v. Annunzio (supra)*, and *Shell Oil Co. v.*

*Cummins* (*supra*), and bound by the rule as stated in *Agricultural Trans. Assn. v. Carpentier,* 2 Ill.2d 19, at page 27, "Where the Supreme Court has declared the law on any point, it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases", we affirm the judgments.

Judgments affirmed.

G. MORAN and EBERSPACHER, JJ., concur.

SUPPLEMENTAL OPINION ON REHEARING

PER CURIAM:

██ We find that the facts and legal issues in these cases are now controlled by *Travis v. Grabiec* (1972), 52 Ill.2d 175, 287 N.E.2d 468; petition for rehearing denied September 29, 1972.

We therefore affirm our initial opinion in these cases.