BRIDGESTONE/FIRESTONE, INC., Plaintiff-Appellee, v. LYNN QUIGLEY DOHERTY, Director, *et al.*, Defendants-Appellants (Jill Adams *et al.*, Defendants-Appellees).

Fourth District   No. 4—98—0029

Argued January 12, 1999.—Opinion filed May 27, 1999.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for appellants.

Lee Ann Russo, Mark P. Rotatori, and Jason G. Winchester, all of Jones, Day, Reavis & Pogue, of Chicago, for appellee Bridgestone/Firestone, Inc.

William LaMarca and Randy E. Blue, both of Sgro, LaMarca & Boshardy, of Springfield, for other appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendants, the Illinois Department of Employment Security (Department) and its Director, Lynn Quigley Doherty, appeal from the order of the circuit court of Macon County reversing on administrative review an award of unemployment benefits to 460 unemployment benefit claimants (claimants) who had participated in a strike against plaintiff Bridgestone/Firestone, Inc. (Bridgestone). The 460 claimants who are defendants in this case join in the Department's argument on appeal. The issues are whether (1) the finding that claimants were entitled to benefits after January 14, 1995, on the basis that the Bridgestone plant in Decatur, Illinois, had resumed substantially

normal operations was against the manifest weight of the evidence and (2) the statutory labor dispute disqualification was lifted when the struck employer hired permanent replacement workers during the strike. We reverse the circuit court and reinstate the Director's decision.

On July 12, 1994, the membership of the United Rubber Workers Union Local 713 (the union) went on strike against Bridgestone's Decatur plant as part of a strike against several Bridgestone plants. The strike ended on May 8, 1995. Claimants were part of the approximately 1,200 striking production employees and applied to the Department for benefits. On September 6, 1994, the Department issued a labor dispute determination concluding that the striking workers were ineligible to receive unemployment benefits pursuant to section 604 of the Illinois Unemployment Insurance Act (Act) because that provision disqualifies an individual from receiving unemployment benefits "for any week *** his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." 820 ILCS 405/604 (West 1994).

Subsequent to the September 6, 1994, determination, the Department received information that a large number of striking workers were advised by Bridgestone that they had been permanently replaced. On February 1, 1995, a representative of the Department requested information from Bridgestone as to the current workforce, *i.e.*, of the 1,256 bargaining unit employees, how many had returned to work, how many had been replaced, had any positions been eliminated and, if so, how many. The letter also requested the current work schedule and the extent of the stoppage of work. The purpose of the request was to help the Department make a timely determination as to the eligibility of the claimants to receive benefits.

In response to the February 1, 1995, request, Bridgestone, on February 15, 1995, sent a terse response to the Department stating in part:

"Until the production level has reached the rate of an appropriate pre-strike period, it is neither necessary nor appropriate to consider whether the Company has returned to 'substantially normal' operations. Thus, the issues of how many strikers have been permanently replaced, the number of production employees in the plant and the current work schedule at the plant—which may be relevant to the issue of a return to 'substantially normal' operations—are not relevant to the issue whether there continues to be a 'stoppage of work' within the meaning of Section 604."

On that same day, the Department's administrative manager, Vic-

tor Napolitano, in a return letter to the response stated that the Department's present information indicated Bridgestone had a full complement of production workers, that it was operating on a full schedule, and that the striking workers had been permanently replaced. The letter stated that these conclusions were made in part because of Bridgestone's failure to respond and requested an immediate reply before issuing a determination on eligibility of the workers for unemployment benefits. The record does not show a response from Bridgestone.

On February 23, 1995, the Department issued a supplemental labor dispute determination (supplemental determination) concluding the work stoppage caused by the labor dispute at the plant ceased during the week ending January 14, 1995, so that the claimants were "not ineligible" for unemployment benefits after January 14, 1995. According to the union, between July 1994 and January 1995, approximately 350 striking workers crossed picket lines to work at the plant. From January 4 through January 17, 1995, Bridgestone sent letters to approximately 943 striking employees informing them they had been permanently replaced. Several newspaper articles from mid-January 1995 reported Bridgestone officials indicated it was using replacement workers and resuming full production at the plant.

Bridgestone appealed the supplemental determination and on October 11, 1995, a hearing was conducted before the Department Director's representative. Various newspaper clippings from mid-January 1995 referred to in the supplemental determination were admitted into evidence, as well as newspaper clippings offered by Bridgestone (quoting a Bridgestone spokesperson that replacement workers had been hired, but that it would take some time before pre-strike production levels would be reached). The February correspondence was also admitted.

Robert Freeman, manager of industrial engineering and production planning for Bridgestone, testified to the plant's operations both before and during the strike. In late June 1994, the plant employed 1,209 "active clock card employees" (union members). From the time the strike began until January 1995, Bridgestone's production force consisted of salaried employees, temporary employees, permanent additional workers, and union workers who crossed picket lines, all doing production work normally done by the striking employees.

On January 4, 1995, Bridgestone offered its permanent additional employees and temporary employees the opportunity to become permanent replacements for the striking workers. The plant began a continuous production schedule (24 hours a day 7 days per week) on January 15, 1995. Before the strike Bridgestone operated five days per

week, with three eight-hour shifts per day. By January 15, the production workforce (comprised of union members who had crossed picket lines, salaried employees, a few temporary employees, and the permanent replacements) was inexperienced, according to Freeman. Some machinery sat idle and Bridgestone had to put off preventive maintenance programs it wanted to implement and could not perform some of the maintenance it performed prior to the strike. Waste percentages also were higher than in 1994. As of January 17, 1995, Bridgestone had hired approximately 725 permanent replacements, and 225 striking employees had returned to work, for a total of 950 employees as opposed to 1,209 before the strike. Bridgestone notified striking employees and the union by letter if they had been permanently replaced.

Freeman also prepared a document comparing the plant's production for each month between January and June of 1995 with the same months in 1994. Freeman measured the plant's production by the aggregate weight of all tires produced and warehoused in a month, and plant productivity reflecting plant efficiency by pounds of tires produced per clock man-hour worked. The total weight of tires warehoused in January 1995 was 44.92% of the amount for January 1994; February 1995 was 50.6% of February 1994; March 1995 was 64.14% of March 1994; April 1995 was 77.44% of April 1994; May 1995 was 82.02% of May 1994; and June 1995 was 78.41% of June 1994.

Plant productivity measured in terms of pounds of tires produced for every man hour worked in January 1995 was 53.86% for January 1994; February 1995 was 45.98% of February 1994; March 1995 was 57.09% of March 1994; April 1995 was 63% of April 1994; May 1995 was 67.22% of May 1994; and June 1995 was 64.95% of June 1994. Freeman explained that lower productivity levels in 1995 could also be attributed to the inexperienced workforce hired in late 1994 and early 1995.

The strike ended May 8, 1995. During most of 1994 until the strike in July, Bridgestone either met or exceeded "ticket levels" (daily production quotas determined by Bridgestone's corporate headquarter's sales forecasts and consumer demand). However, the plant failed to meet the daily ticket beginning in July 1994. In January 1995, the plant met only about one-third of the original ticket set for that month, and an amended reduced ticket for January 1995 went unsatisfied by a "considerable amount."

Freeman acknowledged that between 1991 and 1993, Bridgestone laid off production workers due to poor economic conditions and that the ticket level for the plant during that time was about two-thirds of the plant's normal productive capacity. After the first several months

of 1993, Bridgestone began to raise the ticket level to meet increased demand, and in late 1993, the plant resumed full production and remained at full production levels from January to June 1994. Bridgestone had budgeted for full production for all of 1994.

On January 10, 1996, the Director's representative issued his report recommending affirming the supplemental determination. Bridgestone filed objections, and the Director issued her final decision on January 13, 1997, affirming the supplemental determination. The Director concluded that the number of replacement employees alone was not determinative of whether the plant's work stoppage had ended; however, it was reasonable to infer that as the number of striking workers returning to work plus replacement workers at a plant gets closer to the number of employees working in the plant before the strike, the employer's operations become closer to substantially normal. According to the Director, the number of production employees, by January 15, 1995, approached the prestrike level of approximately 1,200 workers. The Director rejected Bridgestone's argument that production levels had to return to 1994 prestrike levels before plant operations could be considered substantially normal. Bridgestone offered no evidence as to orders or sales forecasts to indicate that production levels between January 1995 and May 1995 were substantially below what was needed. The Director accepted Freeman's testimony and the summary comparison document for purposes of comparing prestrike and poststrike production levels.

Bridgestone brought an administrative review action and the circuit court found the Director's decision to be against the manifest weight of the evidence. The court noted that Bridgestone's act of permanently replacing striking employees, resulting in the unilateral termination of the employment relationship, may have removed the section 604 disqualification as a matter of law even though the work stoppage was ongoing. The court concurred with the legal analysis in *Bridgestone/Firestone, Inc. v. Employment Appeal Board*, 570 N.W.2d 85 (Iowa 1997), and remanded the claims to the Director for further proceedings to determine whether the employment relationship was terminated under circumstances removing the section 604 disqualification. Defendants petitioned for leave to appeal under Rule 306(a)(6) (166 Ill. 2d R. 306(a)(6)), which was granted, and this appeal followed.

■ The factual findings of an administrative agency are viewed as *prima facie* correct, and a reviewing court will not disturb those findings unless they are contrary to the manifest weight of the evidence. *Miller v. Department of Employment Security*, 245 Ill. App. 3d 520, 521-22, 615 N.E.2d 35, 37 (1993). A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.

*Golab v. Department of Employment Security,* 281 Ill. App. 3d 108, 114, 666 N.E.2d 347, 351 (1996). The deference accorded to an administrative agency's findings of fact is not accorded to its conclusions of law, including the erroneous construction of a statute or the legal effect of factual findings. *Boaden v. Department of Law Enforcement,* 267 Ill. App. 3d 645, 649, 642 N.E.2d 1330, 1333 (1994). The legal effect of undisputed facts is a question of law, and the appellate court considers the propriety of the determination *de novo. Fitzpatrick v. Human Rights Comm'n,* 267 Ill. App. 3d 386, 392, 642 N.E.2d 486, 491 (1994). However, where divergent inferences may reasonably be drawn from undisputed facts, a question of fact remains. *Sorenson v. Industrial Comm'n,* 281 Ill. App. 3d 373, 381, 666 N.E.2d 713, 718 (1996), quoting *Metropolitan Water Reclamation District v. Industrial Comm'n,* 272 Ill. App. 3d 732, 734, 650 N.E.2d 671, 673 (1995). The test is whether the record contains sufficient evidence to support the agency's decision, and this court will not substitute its judgment for that of the agency merely because other reasonable inferences could have been drawn from the evidence. *Golab,* 281 Ill. App. 3d at 114, 666 N.E.2d at 351-52.

■ Whether Bridgestone resumed substantially normal operations so that the "stoppage of work" ended is not purely a question of law. The Department had to make a factual determination of whether Bridgestone had returned to substantially normal operations to determine whether the stoppage of work had ceased. *Golab,* 281 Ill. App. 3d at 114, 666 N.E.2d at 351-52. We will review the Department's determination under the manifest weight of the evidence standard.

The general purpose of the Act is to provide compensation for those persons who are involuntarily unemployed. *Ross v. Department of Employment Security,* 201 Ill. App. 3d 474, 477, 559 N.E.2d 100, 102 (1990). However, the Act provides that in certain circumstances a claimant be disqualified from receiving unemployment benefits. The section 604 disqualification provision reflects the legislature's intent to maintain the state policy of neutrality in labor disputes. *Local 7-641, Oil, Chemical & Atomic Workers International Union v. Department of Labor,* 96 Ill. 2d 94, 98, 449 N.E.2d 134, 136 (1983). Illinois courts refuse to "attribute to the legislature an intent to finance strikes out of unemployment compensation funds." *Fash v. Gordon,* 398 Ill. 210, 218, 75 N.E.2d 294, 298-99 (1947).

■ To find a party ineligible for benefits, there must be a specific finding of a "stoppage of work," a "labor dispute," and proximate causation between the labor dispute and the stoppage of work. *Ross,* 201 Ill. App. 3d at 478, 559 N.E.2d at 102. A "stoppage of work" ends " '[when] the employer regain[s] production to a point where business

148

operations are substantially normal ***. Normal operations would mean that conforming to the standard, or regular operation of the employer's plant.' " *Travis v. Grabiec*, 52 Ill. 2d 175, 182, 287 N.E.2d 468, 471 (1972). A skeletal workforce achieving full production by working abnormal hours and performing abnormal functions does not indicate that the plant returned to substantially normal operations. To conclude that substantially normal operations had returned would mean that the employer did not need the striking employees or the existing facilities that were not being used to maintain or replace its equipment. *Travis*, 52 Ill. 2d at 182, 287 N.E.2d at 472. It is inappropriate to consider only gross production without regard to the means by which it was achieved or the continuing disruption of the employer's normal operating methods. *Travis*, 52 Ill. 2d at 179, 287 N.E.2d at 470; see also *Boone v. Department of Labor*, 144 Ill. App. 3d 306, 307-08, 495 N.E.2d 66, 66-67 (1986).

> "Since there is no single pattern or mold which can confine all aspects of all of the varied types of industrial and commercial enterprise and all of the labor disputes in which they and their employees may become involved, it is not surprising that it is difficult to capture all of the variables in a single word or phrase. It may be that there are some situations in which normal operations can be measured accurately enough in terms of gross production. But there are other situations in which a myopic concern with production to the exclusion of the consideration of all other aspects of the enterprise can result in gross distortion." *Travis*, 52 Ill. 2d at 179-80, 287 N.E.2d at 470.

This case presents a different factual situation than those presented in *Travis* and *Boone*. Production levels do not have to return exactly to prestrike levels before an employer reaches "substantially normal business operations."

The record shows that Bridgestone sought to produce evidence that the company had not returned to "substantially normal operations." It presented the testimony of Freeman, which the adjudicator and the Director's representative found related to a summary for which a proper foundation had not been laid. The number of workers at the Decatur plant prior to the strike was about 1,209. It was indicated that 200 strikers at the facility had crossed the picket lines, while 200 workers had retired. According to Freeman, 725 replacement workers at the Decatur plant were hired and working as of January 17, 1995. The representative determined that, based upon these figures, 200 workers crossing the picket lines, 200 workers retired, and 725 employees permanently replaced represented a 90% return of the workforce to the Decatur facility. The employer's refusal to provide

information to the Department with respect to the question of return to substantially normal operations is an appropriate factor to consider in determining the merits of the controversy.

In addition, the newspaper articles concerning the strike and referencing statements made by Bridgestone employees and union representatives were admitted without any hearsay objection. Hearsay evidence admitted without objection may be considered and given its natural probative effect. *Jackson v. Board of Review*, 105 Ill. 2d 501, 508, 475 N.E.2d 879, 883 (1985); *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 682, 658 N.E.2d 1301, 1308 (1995).

There were a number of newspaper articles in evidence in which a Bridgestone official reported that Bridgestone had hired replacement workers and was resuming full production. Bridgestone spokesman Trevor Hoskins was reported in the Woodward Oklahoma News on January 13, 1995, as stating that the Oklahoma City plant was running at full speed. The article indicated that Bridgestone intended two other plants, including the one at Decatur, Illinois, to achieve full production "this weekend." Hoskins was quoted as qualifying his statements by adding that full or continuous production did not mean full capacity and that it would be some time before prestrike production levels were achieved. Similar statements were attributed to Hoskins in the Charleston, Illinois, Times-Courier on January 13, 1995. On February 10, 1995, the Central Illinois Herald & Review reported that Hoskins said (1) Bridgestone was not currently seeking any new employees in Decatur; and (2) when confronted with estimates of only 50% production at that plant, he denied the production estimate and indicated Bridgestone's satisfaction with both production and replacement employees. These articles support the Director's determination that Bridgestone had resumed "substantially normal business operations." Although Freeman's testimony suggested production levels had not returned to the levels in 1994, no evidence of production in other years was presented. In light of the possibility of stockpiling during 1994 in anticipation of a strike, the Director did not have to accept Freeman's testimony on production levels as establishing "normal" business operations.

■ The receipt of unemployment insurance benefits is a conditional right, and the claimant bears the burden of proving his eligibility for those benefits. *Miller*, 245 Ill. App. 3d at 522, 615 N.E.2d at 37. Ordinarily, then, if a claimant has been disqualified from receiving benefits, it is the claimant's burden to establish his eligibility for benefits at a later date. *Cf. Be-Mac Transport Co. v. Grabiec*, 20 Ill. App. 3d 345, 354, 314 N.E.2d 242, 249 (1974) (where it is the

employer's burden to bring an otherwise eligible claimant within the section 604 disqualification). This is so even though the Department has a continuing responsibility to review and reconsider its cases. See 56 Ill. Adm. Code § 2720.160 (1996) (an adjudicator shall reconsider an original finding or determination at the written request of a party or upon receipt of new information relating to the original issues).

Because the claimants were originally disqualified from receiving benefits, they had the burden to establish their eligibility. However, in this case, claimants were in part denied the opportunity to prove their case by Bridgestone's failure to comply with a request for information by the Department. This was information on the production of Bridgestone that was not available to claimants. After Bridgestone's refusal to supply information requested by the Department, Bridgestone was informed that the newspaper reports would be considered proved if it persisted in refusing to supply the requested information.

In essence, the newspaper articles were treated as establishing a *prima facie* case of eligibility for claimants and the burden of going forward shifted to Bridgestone, requiring Bridgestone to rebut the *prima facie* case. Under the circumstances of this case, it was not fundamentally unfair to require Bridgestone to present evidence that its plant had not substantially resumed normal operations.

■ We next consider whether section 604's disqualification is lifted if an employer permanently replaced striking workers and notified them of their permanent replacement. Bridgestone argues that there has been no decision below on this issue since it was only posited by the circuit court in its order of remand and the issue is not ripe for review. Through avoiding premature adjudication, the ripeness doctrine prevents the courts from becoming entangled in abstract disagreements over administrative policies and protects agencies from judicial interference prior to an administrative decision being formalized and its effects felt in a concrete way by the challenging parties. In applying the doctrine, the courts evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 388-89, 639 N.E.2d 571, 574 (1994), quoting *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 546, 370 N.E.2d 223, 226 (1977), and *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967). "A controversy is ripe when it has reached the point where the facts permit an intelligent and useful decision to be made." *People v. P.H.*, 145 Ill. 2d 209, 219, 582 N.E.2d 700, 704 (1991).

■ This matter is ripe for review. The Department did adjudicate the rights and liabilities of the parties with respect to the applicability

of section 604 disqualifying claimants from receiving unemployment benefits, so an "actual controversy" exists as to whether section 604 applies to the claimants. *National Marine,* 159 Ill. 2d at 390, 639 N.E.2d at 574. The Department only failed to consider whether section 604's disqualification was inapplicable for an additional reason. Furthermore, we know that during the strike Bridgestone hired permanent replacements for striking workers and notified striking workers it did so. The Department does not ask for a further opportunity to consider this matter and asks that we now decide the issue. The circuit court, in remanding to take evidence to address this issue, indicated its approval of the standard applied in *Bridgestone/Firestone, Inc.,* 570 N.W.2d 85. Because this is an issue of first impression, the Department needs to know the proper legal standard to be applied in Illinois and this case offers this court the opportunity to provide direction on what that standard is for a potentially recurring circumstance.

On the merits, both the Department and Bridgestone argue that the hiring of permanent replacements does not automatically remove the labor dispute disqualification. The individual claimants, however, contend that permanent replacement of striking employees, which severs the employment relationship, removes the labor dispute disqualification.

Two lines of cases exist on this issue. See 76 Am. Jur. 2d *Unemployment Compensation* § 173 (1992); Annotation, *General Principles Pertaining to Statutory Disqualification for Unemployment Compensation Benefits Because of Strike or Labor Dispute,* 63 A.L.R.3d 88 § 31(b), at 208-15 (1975) (identifying cases relying on each principle). The first holds that permanent replacement of a striking employee removes the disqualification provision because when the employment relationship is terminated, then the disqualification provision, which implies the existence of an employment relationship, no longer applies. In addition, permanent replacement of a striking employee results in his discharge and does not allow any choice on the employee's part to return to his job. So, the labor dispute is no longer the cause for the striking worker's unemployment; rather, his discharge is the intervening cause. 76 Am. Jur. 2d *Unemployment Compensation* § 173 (1992). In *Bridgestone,* a letter Bridgestone sent striking workers notifying them that they were being permanently replaced was held to sever the employment relationship so that the claimants were not disqualified from unemployment benefits under the statutory disqualification provision. Iowa's disqualification provision also imposes benefit ineligibility " 'for any week with respect to which *** the individual's *** unemployment is due to a stoppage of work which exists because of a labor dispute ***.' " *Bridgestone,* 570 N.W.2d at 91, quoting Iowa Code § 96.5(4) (1993).

The employer has the burden to show that it "advised the claimant[s] that despite the hiring of permanent replacements work was still available to them. Even if such work is available, failure to so advise the claimants will result in removing" the disqualification provision. *Bridgestone*, 570 N.W.2d at 95. Furthermore, the claimant does *not* need to make an unconditional offer to return to work to prove that he was permanently replaced by the employer. *Bridgestone*, 570 N.W.2d at 95. Claimants only have the burden to show the termination of the employment relationship by showing they have been permanently replaced. *Arvin North American Automotive v. Review Board*, 598 N.E.2d 532, 537 (Ind. Ct. App. 1992).

The existence of an employment relationship is an essential element in determining unemployment compensation benefits. *Bridgestone*, 570 N.W.2d at 95. The employment relationship is permanently severed by the employer hiring permanent replacements, and the employee no longer has any real interest in the outcome of the labor dispute. Consequently, the labor dispute and resultant stoppage of work are no longer the immediate cause of unemployment. The cause of unemployment is the employer's severance of the employment relationship. *Bridgestone*, 570 N.W.2d at 95-96. As a result, the policy of state neutrality in labor disputes is not compromised when the employer-employee relationship is terminated by the hiring of replacement workers for striking employees. *Bridgestone*, 570 N.W.2d at 96.

The second line of cases rejects the idea that permanent replacement of a striking worker ends, as a matter of law, the application of the disqualification provision. Courts adopting this view reason that the disqualification provision continues to apply to striking workers "notwithstanding their permanent replacement, where the strike continued beyond the date the replacements were hired and none of the claimants abandoned the strike or unconditionally offered to return to work." 76 Am. Jur. 2d *Unemployment Compensation* § 173, at 940 (1992). The disqualification provision may cease to apply if a striking worker offers to return to work during the strike, but the employer refuses his employment because the employer has replaced him. 76 Am. Jur. 2d *Unemployment Compensation* § 173, at 940 (1992).

■ Section 604 of the Act is applicable only to those employees whose unemployment is due to a stoppage of work existing because of a labor dispute and is inapplicable when an employer terminates an employee involved in a labor dispute, even though the labor dispute continues. *Caterpillar Inc. v. Doherty*, 299 Ill. App. 3d 338, 345-46, 701 N.E.2d 1163, 1169 (1998). We hold that an employer's permanent replacement of striking workers terminates the employment relation-

ship and removes the section 604 disqualification according to the standards set forth in *Bridgestone/Firestone, Inc.*, 570 N.W.2d 85, and *Arvin North American Automotive*, 598 N.E.2d 532. .

The Act's purposes of state neutrality and not allowing unemployment compensation funds to support a strike are not implicated when an employer unilaterally discharges a striking worker because, at that time, the worker has no further interest in the labor dispute. Section 604 of the Act presupposes an employment relationship, and when it is severed, the labor dispute between the employer and the striking worker also terminates, along with the employee's real interest in the outcome of the labor dispute. Termination of the employment relationship then becomes the intervening cause of the worker's unemployment, not the work stoppage resulting from the labor dispute. *Bridgestone*, 570 N.W.2d at 95.

For the foregoing reasons, we reverse the order of the circuit court of Macon County and reinstate the Director's decision.

Circuit court reversed; Director's decision reinstated.

KNECHT, P.J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent. As of January 17, 1995, Bridgestone had hired approximately 725 permanent replacements and 225 striking workers had returned to work, a total of 950 employees as opposed to 1,209 before the strike. The Director mistakenly thought 1,100 had come back.

The Department correctly asserts that production levels do not have to return exactly to prestrike levels before an employer reaches substantially normal business operations. But the January production levels here did not even come close to prestrike levels and, combined with the other continuing effects of the strike, the work stoppage at Bridgestone continued. Bridgestone's production of tires in January 1995 was merely 45% of the amount produced in January 1994. Furthermore, the plant's productivity for January 1995 was 54% of that in January 1994. These figures existed despite the fact that, beginning January 15, Bridgestone was operating at continuous production, compared to a 24-hour/5-day-per-week schedule in January 1994. Bridgestone failed to meet the original "ticket level" in January 1995 as well as an amended reduced ticket level.

The evidence also reveals that as of January 15, 1995, Bridgestone was still operating with an inexperienced workforce whose efficiency was well below prestrike levels. Salaried employees and some

154

temporary employees were still working in the plant as of January 15, 1995, and salaried employees continued to train the new workforce. Bridgestone still lacked the necessary number of workers to produce the necessary amount of goods. Some machines sat idle, some prestrike maintenance programs could not be performed, and waste percentages were increased from prestrike levels. Similar to *Travis*, these circumstances do not indicate that, as of mid-January 1995, Bridgestone had returned to substantially normal operations indicating a cessation of the stoppage of work. The Director's finding that the stoppage of work ceased as of that date is against the manifest weight of the evidence.

I understand the majority decision to affirm the Director in large part because of Bridgestone's "terse response" to the Department's February 1, 1995, and February 15, 1995, letters. Bridgestone appropriately stated its position in its response. Bridgestone properly presented its evidence at the time of the hearing. It is improper to rule against Bridgestone here as a sanction. I would affirm the decision of the circuit court.