# IN THE SUPREME COURT OF IOWA

No. 18–0981

Filed February 21, 2020

**TERESA L. SLADEK,**

Appellant,

vs.

**EMPLOYMENT APPEAL BOARD** and
**KELLY SERVICES USA LLC,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Chad A. Kepros, Judge.

A temporary employee appeals from an order denying her petition to review a ruling of the employment appeal board that she voluntarily quit her position with a temporary employment firm and was not entitled to unemployment insurance benefits. **AFFIRMED.**

John S. Allen, Clinical Law Professor, University of Iowa College of Law, Iowa City, and Majed Alzben, Law Student, for appellant.

Rick Autry, Des Moines, for appellee Employment Appeal Board.

**MANSFIELD, Justice.**

### I. Introduction.

This is an administrative appeal challenging a final agency action of the Employment Appeal Board (EAB) denying unemployment benefits. The EAB determined the claimant, a temporary employee, voluntarily quit her employment with a temporary employment agency without good cause attributable to the employer. The district court upheld the EAB's action, and the court of appeals affirmed. This case now comes to us on further review.

Here, the temporary agency informed the temporary employee by phone that the workplace where she had been assigned was dissatisfied with her work performance and was ending her assignment. The employee hung up the phone. The employee did not attempt to resume contact with the temporary agency for almost five weeks—after she had already applied for unemployment benefits and the temporary agency had contested them. Under these circumstances, the EAB denied benefits.

We conclude substantial evidence supports the EAB's determination that the employee voluntarily quit. We also hold that substantial evidence supports the EAB's finding that the employee does not meet the safe harbor in Iowa Code section 96.5(1)(*j*)(1), which relates specifically to temporary employees of temporary employment firms. Under that provision, an individual is not disqualified from benefits if "[t]he individual is a temporary employee of a temporary employment firm who notifies the temporary employment firm of completion of an employment assignment and who seeks reassignment." Iowa Code § 96.5(1)(*j*)(1) (2018). The employee did not seek reassignment in a timely fashion; instead, she hung up the phone. Accordingly, we affirm the judgment of the district court and the decision of the court of appeals.

## II. Facts and Procedural Background.

Teresa Sladek, the petitioner, applied to work at Kelly Services USA, LLC, a temporary employment firm, on December 15, 2015. As a part of the application process, Sladek signed an agreement that included an "Assignment Information and Employment Termination Policy," which stated,

> Within 48 hours of completion of each assignment, I will notify Kelly of my availability for work. I understand I am responsible for maintaining weekly contact with Kelly; failure to contact Kelly may affect my eligibility for unemployment benefits. I understand that once 14 days have passed after my last day worked, my employment with Kelly will be terminated—unless I have been placed on another assignment or qualified leave of absence, or if I am on certain customer-specific assignments. I understand that this does not alter the at-will nature of my employment, my employment may still be terminated at any time, and the terms and conditions of my employment may be changed without notice. I also understand that I may be eligible for reemployment.

> Kelly may offer me assignments for varying lengths of time—I retain the right to reject any offer of assignment. When an assignment ends, Kelly will attempt to place me on another assignment, however there will typically be periods during which no offer of assignment of employment is made.

On December 22, Sladek signed an additional document entitled, "NOTIFICATION OF POSITION END: IOWA," which stated,

> To qualify for unemployment benefits, you must be unemployed through no fault of your own and be actively seeking work. "Actively seeking work" is defined as taking reasonable efforts to return to the workforce.

> Iowa Code Section 96.5-1-j requires that upon completion of an assignment with a temporary employment firm, the temporary employee must contact the firm within three business days to seek reassignment or face disqualification for benefits pursuant to the section listed above. Failure to contact Kelly Services ("Kelly") will indicate that you have either:

> - Voluntarily quit; and/or
> - Are not actively seeking work

This may affect your eligibility for unemployment benefits.

**I have read the above information and understand that failure to contact Kelly within three business days of completing an assignment may affect my eligibility for unemployment benefits. I also acknowledge receiving a copy of this document.**

Later, Sladek acknowledged receipt of these policies in her hearing testimony.

Sladek began employment with Kelly as a temporary employee on January 5, 2016. She was assigned to R. R. Donnelley for her first of three jobs. This assignment lasted for approximately three weeks before R. R. Donnelley determined that Sladek was not a good fit for the post. Sladek received the news through her supervisor at Kelly. At that time, Sladek did not explicitly ask Kelly for reassignment. When her first assignment ended, Sladek applied for and received unemployment benefits.

Sladek's second assignment began March 2 with ACT, the testing organization. She worked as a document processor until May 22 when her assignment ended because there was no more work to be done. Again, Sladek did not explicitly ask for reassignment. When this second assignment ended, Sladek once more applied for and received unemployment benefits.

Sladek's third and final assignment through Kelly was also at ACT but as a customer service representative rather than a document processor. She began this assignment on July 11 and continued in this role until June 28, 2017.

While working as a customer service representative at ACT, Sladek struggled to keep her "handle time" down. Handle time is the amount of time a service representative remains on a phone call with a customer. ACT's goal was to keep the phone call to between five and six minutes in

duration, and this was measured by an average at the end of the month. Sladek's averages were often at least twice the target length, and she was aware that this was problematic. She expressed to her contact person at Kelly, Staci Payne, concerns that she might lose the assignment due to her inadequate handle times.

Payne was a Kelly senior account talent manager who worked exclusively on the ACT account out of the ACT campus. Payne had multiple conversations with Sladek about Sladek's problems in processing calls efficiently. She testified that ACT even moved Sladek's desk next to that of a supervisor to better help her and that supervisors reviewed Sladek's calls. These efforts were to no avail, and Sladek's handle times failed to improve.

On June 28, Payne called Sladek on the telephone and informed her that due to ACT not seeing the improvement it was hoping for and expecting in Sladek's average handle times, ACT was releasing Sladek from the assignment. Accordingly, Payne instructed Sladek not to return to ACT. Sladek became upset and began to cry. She told Payne that the termination of the assignment was not fair. When it became clear to Sladek that her pleas to keep her ACT job would be unsuccessful, Sladek hung up on Payne. She did not ask for another assignment while on the call, nor did Payne offer another assignment. Payne did not subsequently reach out to Sladek. Later, Payne testified, "After she hung up on me I did not contact her because that, you know, she made a pretty bold statement there by hanging up on me so that I did not contact her. I waited to hear back from her."

On July 2, Sladek applied for unemployment benefits. Kelly opposed the request, taking the position that Sladek had voluntarily quit. In its response to an Iowa Workforce Development (IWD) questionnaire, Kelly

indicated that Sladek had not maintained contact with Kelly, that Kelly's employment agreement required Sladek to notify Kelly of her availability for work within forty-eight hours of the completion of each assignment, that another signed form required Sladek to contact Kelly within three business days and seek reassignment or face disqualification for unemployment benefits on the basis of having voluntarily quit, and that Sladek had not contacted Kelly for reassignment within three working days of the last date of work.

IWD tried to reach Sladek by phone on July 28 after receiving the response from Kelly. IWD and Sladek did not connect until July 31. At that point, Sladek conceded she had not contacted Payne after June 28. She explained that she "was having anxiety issues" and "was afraid to contact them. [She] felt bad for hanging up on [Payne]."

Sladek did not get in touch with Kelly again until that same date of July 31.[1] On a phone call with Payne, Sladek apologized for hanging up on Payne and told Payne that she wanted another assignment, as long as it was not production work due to her physical limitations. Payne reported to Sladek that there were no available assignments at ACT and that Payne was not sure if she would be comfortable placing Sladek again due to Sladek's conduct on the June 28 phone call. After more conversation, Payne yielded and told Sladek that if something became available, Payne would reach out to Sladek, although not if it was another customer service assignment with ACT. She also told Sladek to review Kelly's website for assignments other than with ACT.

---

[1]The record does not directly indicate whether Sladek's call to Payne preceded or followed Sladek's phone call with IWD. Circumstantially, it appears the call with IWD came first. Presumably Sladek would not have told IWD on July 31 that she had last spoken to Payne on June 28 if she had just talked with Payne earlier that day.

Also on July 31, IWD issued a written unemployment insurance decision that Sladek received two days later on August 2. The decision stated,

> YOU ARE NOT ELIGIBLE TO RECEIVE UNEMPLOYMENT INSURANCE BENEFITS. . . .
>
> . . . .
>
> . . . OUR RECORDS INDICATE YOU VOLUNTARILY QUIT YOUR EMPLOYMENT ON 06/28/17, WHEN YOU FAILED TO NOTIFY THE TEMPORARY EMPLOYMENT FIRM WITHIN THREE WORKING DAYS OF THE COMPLETION OF YOUR LAST WORK ASSIGNMENT. YOU HAD BEEN TOLD IN WRITING OF YOUR RESPONSIBILITY TO NOTIFY THE FIRM.

Sladek appealed the denial to the Unemployment Insurance Appeals Bureau. An in-person hearing was held before an administrative law judge (ALJ) at which both Sladek and Payne testified. On September 29, the ALJ affirmed in writing the denial of unemployment benefits, finding that Sladek "separated from employment without good cause attributable to the employer." Referencing Iowa Code section 96.5(1) and Iowa Administrative Rules 871—24.25(28) and 871—24.26(15), the ALJ entered the following conclusions of law:

> The purpose of [Iowa Code section 96.5(1)(*j*)] is to provide notice to the temporary agency employer that the claimant is available for *and seeking work* at the end of the temporary assignment. While the administrative law judge understands that claimant had never been expected to strictly comply with the three-day policy, this separation from employment is different from claimant's previous separations. During her previous separations from temporary assignments, the employer offered to seek additional work for her. That was not the case during her separation on June 28. At no point during the June 28 conversation did the claimant ask for or the employer offer any additional work. Further, claimant abruptly ended the conversation by hanging up on the employer, and she made no additional contact for approximately four weeks. The employer had no reason to believe that claimant was seeking an additional assignment. Rather, the administrative law judge believes that claimant hanging up on the employer and ceasing contact for multiple

weeks demonstrates an intent to end her employment relationship with the temporary staffing agency.

. . . .

. . . Claimant hung up on the employer and did not reach out for multiple weeks to notify the employer if she was interested in any additional work. Claimant's end of employment was without good cause attributable to the employer. Benefits are withheld.

On October 12, Sladek appealed the ALJ decision to the EAB. The EAB adopted the ALJ's findings and conclusions in whole on November 9.

Sladek petitioned for judicial review in the Iowa District Court for Johnson County on December 6. The district court upheld the EAB ruling on May 16, 2018. Among other things, the court concluded, "The record provides substantial evidence for the EAB's factual finding of voluntary quitting, including that Sladek hung up on her supervisor and failed to follow up with Kelly for approximately four weeks."

On June 5, Sladek appealed the district court's order, and we transferred the case to the Iowa Court of Appeals. On May 15, 2019, the Iowa Court of Appeals affirmed the district court.

Sladek applied for further review to this court, and we granted her application.

**III. Standard of Review.**

"When reviewing the decision of the district court's judicial review ruling, we determine if we would reach the same result as the district court in our application of the Iowa Administrative Procedure Act." *Insituform Techs., Inc. v. Emp't Appeal Bd.*, 728 N.W.2d 781, 787 (Iowa 2007). We generally defer to the EAB's findings of fact if supported by substantial evidence. *See* Iowa Code § 17A.19(10)(*f*). However, in a recent case, we made clear that we would not defer to the EAB's interpretation of various legal terms used in Iowa Code section 96.5 including "voluntary." *Irving*

*v. Emp't Appeal Bd.*, 883 N.W.2d 179, 185 (Iowa 2016). Accordingly, we will review the EAB's legal interpretations for errors at law. *See* Iowa Code § 17A.19(10)(*c*). We have said that we "construe the provisions of [chapter 96] liberally to carry out its humane and beneficial purpose." *Bridgestone/Firestone, Inc. v. Emp't Appeal Bd.*, 570 N.W.2d 85, 96 (Iowa 1997).

### IV. Did Sladek Voluntarily Quit Her Employment Without Good Cause Attributable to the Employer?

**A. The Controlling Law.** Iowa Code section 96.5 provides, in part,

> An individual shall be disqualified for benefits, regardless of the source of the individual's wage credits:
>
> 1. *Voluntary quitting.* If the individual has left work voluntarily without good cause attributable to the individual's employer, if so found by the department. But the individual shall not be disqualified if the department finds that:
>
> . . . .
>
> *j.* (1) The individual is a temporary employee of a temporary employment firm who notifies the temporary employment firm of completion of an employment assignment and who seeks reassignment. Failure of the individual to notify the temporary employment firm of completion of an employment assignment within three working days of the completion of each employment assignment under a contract of hire shall be deemed a voluntary quit unless the individual was not advised in writing of the duty to notify the temporary employment firm upon completion of an employment assignment or the individual had good cause for not contacting the temporary employment firm within three working days and notified the firm at the first reasonable opportunity thereafter.

Iowa Code § 96.5(1)(*j*)(1).

Thus, the section establishes a general rule that "voluntary quitting" disqualifies an individual from unemployment benefits. However, an individual *is not* disqualified if the individual "is a temporary employee of a temporary employment firm who notifies the temporary employment firm

of completion of an employment assignment and who seeks reassignment."
*Id.* Additionally, an individual *is* deemed to have voluntarily quit if the individual fails to notify the temporary employment firm of completion of an assignment within three working days (subject to certain qualifications). *Id.*

In other words, as we read it, the statute contains (1) a rule, (2) an exception to the rule, and (3) an exception to the exception to the rule.

There is no dispute that Sladek was a temporary employee within the meaning of Iowa Code section 96.5, and Kelly was a temporary employment firm. *See id.* § 96.5(1)(*j*)(3) (defining these terms). It is equally undisputed that Sladek was advised in writing of the notification requirement, and Sladek signed a document indicating her receipt and understanding of the policy. *See id.* § 96.5(1)(*j*)(2) (discussing these requirements).

**B. Applying the Law Here.** To begin, we conclude substantial evidence supports the EAB's finding that Sladek voluntarily quit within the meaning of Iowa Code section 96.5(1). On June 28, 2017, Sladek hung up on Payne, her supervisor. She did not reach out again until five weeks later, apparently after learning that Kelly was contesting Sladek's claim for unemployment benefits. As the EAB found,

> The employer had no reason to believe that claimant was seeking an additional assignment. . . . [C]laimant hanging up on the employer and ceasing contact for multiple weeks demonstrate[d] an intent to end her employment relationship with the temporary staffing agency.

This factual finding is subject to a substantial evidence review, and we conclude it is supported by substantial evidence.

Having upheld the finding of a voluntary quit within the meaning of Iowa Code section 96.5(1), we now address whether the safe harbor in the

first sentence of section 96.5(1)(*j*)(1) applies. Did Sladek notify Kelly of her completion of the ACT assignment and "seek[] reassignment"? If so, she is not disqualified from benefits unless the second sentence of section 96.5(1)(*j*)(1) applies.

Here too, the EAB's finding is supported by substantial evidence. It is clear that Sladek did not seek reassignment from Kelly on June 28. To the contrary, she hung up on her boss.

Sladek raises two arguments to the contrary. First, she contends that Kelly had actual notice her assignment had ended. That ignores the second part of the safe harbor's sentence which reads, "and who seeks reassignment." *Id.* § 96.5(1)(*j*)(1). There is no evidence Sladek sought reassignment on June 28. Sladek's argument would render part of the statute mere surplusage. *See id.* § 4.4(2) (setting forth the presumption that "[t]he entire statute is intended to be effective").

Second, Sladek insists that she did seek a new assignment, although not until July 31. However, this was over a month later, after Sladek had already sought unemployment benefits and after she had apparently learned through an IWD phone call that Kelly was contesting her benefits. Iowa Code section 96.5(1)(*j*)(1) does not say *when* the temporary employee must seek reassignment, but principles of reasonableness apply. *See id.* § 4.4(3) (setting forth the presumption that "[a] just and reasonable result is intended"). Whatever the scope of the safe harbor in the first sentence of section 96.5(1)(*j*)(1), it clearly does not encompass such a belated request.

The final issue is whether the exception to the exception in the second sentence of Iowa Code section 96.5(1)(*j*)(1) applies. The parties read the statute differently. The EAB maintains that Sladek had to affirmatively notify Kelly that the ACT assignment was over; Sladek argues it was

enough that Kelly knew the assignment had ended. *See id.* § 96.5(1)(*j*)(1). But we need not resolve this dispute. Because Sladek voluntarily quit her employment with Kelly and failed to request a new assignment within a reasonable time, she is already disqualified from benefits.

A Pennsylvania appellate court recently decided a case on similar facts. *See Thiessen v. Unemployment Comp. Bd. of Review*, 178 A.3d 255 (Pa. Commw. Ct. 2018). In *Thiessen,* the employee signed on with a temporary staffing agency, executing an agreement that required him to contact the agency within forty-eight hours of the completion of assignment and request a new assignment. *Id.* at 257. The employee was assigned to perform work at Veeva. *Id.* at 257–58. On August 26, the temporary agency contacted the employee and informed him his services were no longer needed at Veeva. *Id.* at 258. "When notifying him, Employer did not offer Claimant a new assignment." *Id.* In December, the employee applied for unemployment benefits and was ultimately denied. *Id.* at 258–59.

In upholding this administrative decision, the court reasoned as follows:

> Employees of temporary staffing agencies who fail to follow the employer agency's policies regarding work availability will be considered to have voluntarily quit "work."
>
> In this case, Employer's policy specifically provides that an employee will be considered "to have voluntarily quit employment" should he or she fail to contact Employer within 48 hours of the completion of an assignment. Claimant admits that he signed an agreement with Employer containing this provision and that he was aware Employer had such a policy, both in his response to the claimant questionnaire and at the hearing.

*Id.* at 261 (citations omitted). The court also rejected the employee's argument that there was no voluntary quit "because he had forgotten

about the policy and Employer failed to remind of it when calling to inform him that his assignment with Veeva had ended." *Id.*; *see also Careerxchange, Inc. v. Unemployment Appeals Comm'n*, 916 So. 2d 68, 70 (Fla. Dist. Ct. App. 2005) ("The statute is designed to allow temporary employees to preserve their qualification for unemployment by notifying their employers at the conclusion of an assignment *that they are still available for work.* If work is available, the employee continues the relationship with the temporary employment firm. If no work is available, the employee preserves his or her right to unemployment compensation benefits." (Emphasis added.)).

**C. Sladek's Out-of-State Caselaw Is Not on Point.** In contrast to *Thiessen*, the out-of-state cases cited by Sladek are easily distinguishable. Sladek first refers us to the Minnesota Supreme Court case of *Brown v. Port of Sunnyside Club, Inc.* in support of her assertion that hanging up during a telephone call of heightened emotion should not be characterized as a quit. *See* 304 N.W.2d 877, 879 (Minn. 1981). There, the employee and his supervisor became engaged in a shouting match. *Id.* at 878. The employee began to walk away, and his supervisor called after him to "keep on walking." *Id.* The employee "inferred from this statement that he had been dismissed from employment." *Id.* The court ultimately determined that the employee's "temporary removal of himself from a heated and frustrated argument was not an unreasonable act and cannot be viewed as a voluntary termination." *Id.* at 879. Rather, "the general manager's statement to [the employee] to keep on walking constitutes an involuntary termination." *Id.* Here, Sladek hung up the phone on her supervisor, and unlike the supervisor in *Brown*, Sladek's supervisor at Kelly did not respond or even get a chance to do so.

Sladek also relies on *Mbong v. New Horizons Nursing*, decided by the Minnesota Court of Appeals. *See* 608 N.W.2d 890 (Minn. Ct. App. 2000). There, the court was asked to decide whether an employee of a temporary agency who rejected day-to-day assignments in order to search for permanent fulltime employment could be found to have quit employment. *Id.* at 893. Invoking the decision of *Smith v. Employers' Overload Co.*, 314 N.W.2d 220 (Minn. 1981), the court held "the failure of [a claimant] to accept further fill-in assignments from [a temporary employment firm] does not constitute a 'quit' under" the Minnesota unemployment compensation statute. *Id.* at 894; *see also Smith*, 314 N.W.2d at 221–22 (holding that there was not an ongoing employment relationship with a temporary employment firm at the completion of a one-day spot labor assignment which paid out at the end of each day worked). The court was apprehensive that characterizing the relationship between a temporary employee and a temporary employment firm as ongoing employment would "trap" temporary employees in an unfair relationship in which only the employee was obligated to perform. *Mbong*, 608 N.W.2d at 894. Relying on "basic contract principles," the court elaborated,

> With temporary agencies, an employment relationship arises only when each temporary assignment is offered and accepted. Once each assignment is completed, the employment relationship ends because there is neither a guarantee of future assignments nor any employer obligation to provide them.

*Id.* at 895.

Our case presents a different set of circumstances. Sladek hung up on her supervisor after being told her assignment at ACT was ending and thereafter failed to contact Kelly for nearly five weeks. Kelly does not contend Sladek voluntarily quit as the employer did in *Mbong* because she

declined a proposed assignment. *Mbong* is factually and legally distinguishable.

Sladek relies also on *Cintemp, Inc., CTI Personnel v. Unemployment Insurance Review Board of the Indiana Department of Workforce Development,* decided by the Indiana Court of Appeals. *See* 717 N.E.2d 988 (Ind. Ct. App. 1999). *Cintemp* is distinguishable. There, fifteen employees of a temporary agency were placed with companies that could elect to permanently hire the individuals after a trial placement, otherwise known as a temp-to-hire arrangement. *Id.* at 990. The client companies offered the assignees permanent employment, which they accepted after being also told that they probably would not be able to continue as temporary assignees. *Id.* at 990–91. According to the employees' contract with the temp agency, this ended their employment with the temp agency. *Id.* The client companies then laid the workers off. *Id.* at 990. The employees applied for unemployment compensation. *Id.* at 990–91. It became necessary to classify their prior separation of employment from the temp agency. *Id.* at 991. The Indiana Court of Appeals found that the separation was neither a quit nor a discharge, so no disqualification from benefits would be imposed. *Id.* at 992–93. Sladek, in contrast, did not lose her position with Kelly because she had to accept permanent employment with ACT in order to continue working there. *Cintemp* is likewise factually and legally distinguishable.

It is also worth noting, as did our court of appeals, that certain provisions of Sladek's employment contract with Kelly reinforce the conclusion she voluntarily quit. Within forty-eight hours of her completion of the assignment with ACT, Sladek was supposed to notify Kelly of her availability for work. She did not. Sladek was responsible for maintaining weekly contact with Kelly and agreed that failure to contact Kelly could

affect her eligibility for unemployment benefits. Yet Sladek allowed nearly five weeks to lapse before contacting Kelly.

## V. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court and the decision of the court of appeals denying Sladek's petition for judicial review.

**AFFIRMED.**

All justices concur except Appel, J., who concurs specially.

**APPEL, Justice (concurring specially).**

Two issues were raised by temporary employer Kelly Services USA, LLC (Kelly) before the administrative law judge and the Employment Appeal Board in this case. First, Kelly claimed that Teresa Sladek was not entitled to unemployment benefits because she failed to notify Kelly, as her employer, within three days of the termination of her employment as required by Iowa Code section 96.5(1)(*j*)(1) (2018). Second, Kelly claimed that Sladek voluntarily quit her job with Kelly.

On the first issue, I have my doubts. It was undisputed that when Sladek was having trouble with her temporary job at ACT, Sladek repeatedly told Kelly that she wanted continued employment and that Kelly representatives assured her that they would look for other employment for her. It is similarly undisputed that Kelly knew that in the event Sladek was terminated from her temporary position at ACT, she wanted another job. The conversation between Sladek and Sladek's contact person at Kelly, Staci Payne, after Sladek's job with ACT came to an end must be seen in the context of the earlier conversations that preceded it. Under the circumstances, I do not think that Kelly can credibly argue that it did not know that Sladek desired alternate employment through Kelly one way or another.

So what is the purpose of providing notice duplicative of a fact one already knows? Iowa Code section 96.5(1)(*j*)(1) does not require magic words in order to protect the veritable fortress of unemployment benefits against a claim by a temporary employee who becomes upset when she is terminated from her position. A hypertechnical "tell them what you have already repeatedly told them" approach would have to be squared with our repeated admonition that the provisions of the Iowa Employment Security

Law are to be construed "liberally to carry out its humane and beneficial purpose." *Bridgestone/Firestone, Inc. v. Employment Appeal Bd.*, 570 N.W.2d 85, 96 (Iowa 1997); *see, e.g., Irving v. Employment Appeal Bd.*, 883 N.W.2d 179, 192 (Iowa 2016); *Brumley v. Iowa Dep't of Job Serv.*, 292 N.W.2d 126, 129 (Iowa 1980); *Smith v. Iowa Employment Sec. Comm'n*, 212 N.W.2d 471, 472–73 (Iowa 1973). Further, as the district court noted, Sladek did not attempt to give an explanation that would fall under the good-cause-for-delay requirement of Iowa Code section 96.5(1)(*j*)(1). As the district court noted, "If she had done so, it is highly possible that the result would be different . . . ."

Assuming without deciding that Sladek should not be disqualified based on a nonfunctioning, hypertechnical application of the three-days-notice requirement, I now turn to the question of whether Sladek voluntarily quit her employment at Kelly. As recognized by the administrative law judge, Iowa Administrative Code rule 871—24.25 provides that a voluntary quit without cause, "[i]n general, . . . means discontinuing the employment because the employee no longer desires to remain in the relationship of an employee with the employer from whom the employee has separated."

Here, the record establishes that Sladek hung up on Payne in frustration about losing her job at ACT and did not call Payne back for several weeks. Sladek only called Payne after Kelly contested her unemployment benefits. Although Sladek insisted that she did not call back earlier because she was embarrassed by her behavior, I have examined the hearing transcript and find there was sufficient evidence in the record to support an inference that Sladek was so frustrated with employment through Kelly that she was finished with the agency. Under this view of the record, the call back to Payne was too late and may have

been made with the aim of improving her position regarding unemployment benefits more than to actually obtain another job through Kelly.

The record would also support a contrary conclusion. Temporary employment was critical to Sladek, and hanging up on Payne could be viewed as a deeply felt emotional expression of frustration with her predicament. Yet, as the district court rightly observed, we do not review administrative findings de novo. Because the agency's fact-finding on the issue of voluntary quit is supported by substantial evidence, I agree with the result in this case.